456 August 6, 2025 No. 712

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JOHN ANTHONY DIMOLFETTO, JR.,
*Defendant-Appellant.*

Linn County Circuit Court
20CR26835, 20CR58130; A179213 (Control), A179214

Brendan J. Kane, Judge.

Argued and submitted December 04, 2024.

Zachary J. Stern argued the cause for appellant. Also on the briefs was Stern Law.

Michael A. Casper, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Aoyagi, Presiding Judge, Joyce, Judge, and O'Connor, Judge.*

JOYCE, J.

In Case No. 20CR26835, convictions on Counts 5, 6, 7, 8, and 9 reversed; remanded for resentencing; otherwise affirmed. In Case No. 20CR58130, remanded for resentencing; otherwise affirmed.

_____

* O'Connor, Judge *vice* Mooney, Senior Judge.

**JOYCE, J.**

Defendant was convicted of multiple counts of using a child in a display of sexually explicit conduct, encouraging child sexual abuse, and luring a minor. His convictions were based on evidence that he used anonymous texting applications and false names to contact girls and convince them to send him sexually explicit photos and engage in sexually explicit conduct. On appeal, he raises 31 assignments of error. Those challenges can be broken down into several categories: (1) challenges to the multiple warrants that officers obtained to search the records of the third-party texting applications that he used to contact the victims; (2) a challenge to a warrant to search himself and his phone; (3) challenges to the constitutionality of two statutes under which he was charged, ORS 163.670 and ORS 163.684, as violating his free speech rights; (4) state and federal confrontation clause challenges to the admission of out-of-court statements by non-testifying complainants; and (5) 23 challenges to the sufficiency of evidence supporting his convictions. The state concedes that five of defendant's convictions should be reversed because they were based on events that occurred outside of the jurisdiction. We accept the state's concession on those counts and reverse. We otherwise affirm on defendant's claims of error.

## I.   MOTIONS TO SUPPRESS

In his first six assignments of error, defendant challenges five warrants, two issued in Washington in April 2020 and three issued in Oregon in May 2020.[1] We begin with the April 2020 warrants because our conclusions with respect to those warrants inform the analysis of the May 2020 warrants. As explained below, we conclude that the trial court correctly denied defendant's motions to suppress evidence obtained pursuant to the April 2020 warrants. We further conclude that the trial court correctly denied defendant's motions to suppress evidence obtained pursuant to the May 2020 warrants.

---

[1] Defendant does not challenge warrants issued in June 2020.

A.  *April 2020 Warrants to Search Pinger and TextNow Records*

We state the uncontroverted facts as recited in the affidavit supporting the request for the search warrant. *State v. Burnham*, 287 Or App 661, 662, 403 P3d 466 (2017), *adh'd to as modified on recons*, 289 Or App 783, 412 P3d 1233 (2018). An officer with the Vancouver police department responded to a report of "possible communication with a minor with immoral intent," after a mother discovered sexually explicit text messages between her 11-year-old daughter, A, and a self-described 25-year-old man named "Johnny" on the mother's cell phone. The officer asked A if she would talk to them about the texts, and A refused. A's mother showed the texts to the officer, and they included the messages between A and Johnny, as well as messages between A and a person named "Karra."

Karra first contacted A on a social media application called YUBO on March 11, 2020. Karra asked A what her sexual orientation was and asked for A's phone number, which A provided. During the text conversation that followed, A told Karra that she was 13 years old, and Karra said she was also 13 years old. Karra said she wanted to share a nude picture of her breasts with A and asked A, "Could I see back?" A said, "Um I'm kinda insecure abt that kinda stuff," and Karra replied, "Me too I'm small but I wanna show I like you and trust you." Karra sent a nude picture of breasts and said, "Ur turn then." A sent a picture of her breasts, and Karra said, "lol they hard u turned on?" A said "Nah I'm cold lmao," to which Karra replied, "Wish I was there I would keep u warm and then they would be hard cause ur turned on haha."

Karra told A that she has a friend who she has phone sex with named "Johnny" and that she wanted A to have phone sex with him. Karra told A that she was going to give Johnny A's phone number, and then Johnny texted A, introducing himself and asking if A has any pictures. A sent a nonsexual picture of her face. Johnny asked A if he could call her, told her he was 25 years old, and asked how old she was. A told him she was 13 years old. Johnny then sent a series of sexually explicit messages to A. The conversation continued over text message the following day, when

Johnny told A that he loves her, desperately wants to talk to her, and would give her his credit card if she "need[s] love."

Givens, a detective in the cybercrime unit, discovered that Karra's phone number (ending in 0089) was associated with a communications provider called Pinger and that Johnny's phone number (ending in 7417) was associated with a communications provider called TextNow. Givens sent "preservation request[s]" to both Pinger and TextNow asking them to preserve data associated with Karra and Johnny's phone numbers. Givens received information from YUBO, the social media app, and discovered that three photos of a girl, who was approximately 12 to 16 years old, were associated with the YUBO account, and the user was located near Gates, Oregon. The phone number associated with the YUBO account was the same number that Johnny used to communicate with A. Because Johnny's phone number was associated with YUBO and "Karra" first contacted A through YUBO, Givens suspected that Karra and Johnny were "very likely *** the same suspect."

In addition to those facts, the affidavit included information about Givens's training and experience, and averments based on that training and experience, including that "some suspects with a sexual interest in minor females may create personas of female minors in order to meet and befriend female minors online. They then may use that minor persona to introduce the victim to an adult persona, allowing for more interactive contact such as phone calls and video chat." Further, "[t]hose who produce, receive and attempt to receive child pornography may collect sexually explicit or suggestive materials *** [and] may use these materials to lower the inhibitions of children they are attempting to seduce *** [and] may correspond with and/ or meet others to share information and materials *** and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography." Givens averred that "[i]n light of the image forwarded by the suspect *** and the request for images from the minor victim, there is probable cause to believe the suspect has maintained a collection of child pornography ***."

The affidavit also included information about "providers like Pinger [and] TextNow," including that, "[i]n general," they "ask each of their subscribers/customers to provide certain personal identifying information when registering for an account [such as] the subscriber's full name, physical address, telephone numbers and *** email addresses ***." And they "typically retain certain transactional information about the creation and use of each account on their systems[,] [which] can include *** records of log-in (*i.e.* session) times and durations *** and other log files that reflect usage of the account." Providers also often have records of the internet protocol (IP) address "used to register the account and associated with particular logins to the account," and that information "can help identify which computers or other devices were used to access the account."

Givens asserted that, based on the facts in the affidavit, there was probable cause to believe that evidence, fruits, and instrumentalities of violations of the Washington crimes of communication with a minor for immoral purposes and sexual exploitation of a minor would be found in the Pinger account associated with the "0089" phone number and the TextNow account associated with the "7417" number. A Washington magistrate issued two warrants (the April warrants), one authorizing a search of the Pinger account and one authorizing a search of the TextNow account. Both warrants authorized a search for information dating back to March 9, 2020—two days before Karra and Johnny first contacted A—and continuing until the date that the warrants were issued, which was April 22, 2020. The warrants included the following search categories:

"1.   All user profile information provided to [Pinger/TextNow], including all demographic information, and service date range;

"2.   Any information provided as a means of 2-step verification or for account registration/recovery purposes, to include phone numbers, email addresses, and dates of most recent use of verification or recovery;

"3.   A list of all devices used by this user from account creation until the date of this warrant, including:

"a. Any unique identifiers employed by [Pinger/TextNow];

"b.  Make/Model of each registered device, if known;

"c.  IMEID or other unique numbers identifying any device;

"4.  Login history over the time period listed by each number, to include IP addresses and ports, dates and times, and any unique device identifiers included, indicating for each whether via mobile device or desktop;

"5.  Content of all text SMS (Short message Service) messages, MMS (multimedia message service) messages, as well as any phone calls, over the time period listed for each number, to include attachments;

"6.  A list of any and all contacts;

"7.  Dates indicating the start and conclusion of service with regard to user at the date and time listed."

Pursuant to the April warrants, Vancouver police officers obtained a total of 12 data files from Pinger and TextNow. Because the information from YUBO indicated that the person using the accounts was located in Linn County, Oregon, Vancouver law enforcement forwarded the files to the Linn County Sheriff's Department. Linn County Sheriff Detective Trenary opened the files to look for evidence related to the incident with A, and he immediately discovered texts and images that involved victims other than A. Trenary subsequently obtained warrants in May 2020 to examine the data files sent from Washington for evidence of Oregon offenses, as well as to search defendant and any digital devices discovered on his person. Based on evidence obtained from those warrants and additional evidence discovered during the investigation, Trenary obtained additional warrants in June 2020.

Defendant filed motions to suppress evidence obtained from the April 2020 Pinger and TextNow warrants, arguing that, among other things, the searches and seizures violated the heightened particularity requirement of Article I, section 9, of the Oregon Constitution announced in *State v. Mansor*, 363 Or 185, 421 P3d 323 (2018) (*Mansor*

*II*).[2] *See id.* at 218 (to satisfy the particularity requirement, a warrant to search a computer "must identify, as specifically as reasonably possible in the circumstances, the information to be searched for, including, if relevant and available, the time period during which that information was created, accessed, or otherwise used").

In defendant's view, the affidavit established probable cause only for information related to A and A's phone number and only for the time period of March 11 and 12, 2020, the dates when A communicated with Karra and Johnny. Thus, because the warrants did not limit the search to information related to A and A's phone number, and included the timeframe of March 9, 2020, through April 22, 2020, defendant argued that the warrants were overbroad. *See id.* at 212 (specificity and overbreadth are two distinct concepts that inform the particularity analysis, and a warrant "must not authorize a search that is 'broader than the supporting affidavit supplies probable cause to justify'"). Defendant also argued that the warrants were impermissibly nonspecific because they authorized a search for "'any' or 'all' information of a particular type of digital data."

At the hearing on the motion, defendant also argued that the April warrants were overbroad because the affidavit did not establish probable cause to believe that the *content* of defendant's messages would be found in the Pinger and TextNow servers. Defendant contended that, because the affidavit included only information about those providers' practices with respect to subscriber, transactional, log-in, and IP address information, a neutral and detached magistrate could not reasonably conclude that the providers retained the content of defendant's messages.

The state argued that the heightened standard from *Mansor II* does not apply to records retained by third parties and that, under the regular standard, the April warrants were not overbroad or impermissibly nonspecific.

The trial court denied defendant's motions after concluding that there was sufficient information in the affidavit

---

[2] Defendant also argued that the searches and seizures violated the Fourth Amendment to the United States Constitution. Defendant does not renew that argument on appeal.

that Pinger and TextNow would store the content of defendant's messages; that the court had "to look at [the Pinger and TextNow records] differently than say a cellphone," and thus the heightened standard from *Mansor II* does not apply; and that the parameters in the April warrants, including the timeframe, were not overbroad. Defendant filed motions to reconsider the denial of his motions to suppress the April warrants, renewing his previous arguments, and the trial court denied those motions.

Defendant appeals the trial court's denial of his motions to suppress and for reconsideration, reprising his arguments that the April warrants were overbroad under *Mansor II* because (1) the affidavit did not establish probable cause that the content of defendant's messages would be located on the Pinger and TextNow servers; and (2) the warrants did not limit the search to information related to A and to the two-day timeframe when A communicated with Karra and Johnny. Defendant further renews his argument that the warrants were impermissibly nonspecific because they authorized searches for "all user profile information," "any information" regarding account registration, and the "content of all text messages" over the course of an arbitrary timeframe. The state argues, as it did below, that the heightened particularity standard from *Mansor II* does not apply, and that under the regular standard the warrants were not overbroad or impermissibly nonspecific.

We review a trial court's denial of a motion to suppress for errors of law and are bound by the court's factual findings if there is constitutionally sufficient evidence to support them. *State v. Hargrove*, 327 Or App 437, 443, 536 P3d 612 (2023). Whether a warrant satisfies the particularity requirement of Article I, section 9, of the Oregon Constitution is an issue we review for errors of law. *Id*. A presumption of regularity arises when a search is warranted, and the defendant bears the burden of proving the unlawfulness of a warranted search. *Id*. In resolving a challenge to a search warrant, we look at "the totality of the circumstances presented in the affidavit, *** and we resolve doubtful or marginal cases in favor of the preference for warrants[.]" *State v. Miser*, 303 Or App 347, 352, 463 P3d

599, *rev den*, 366 Or 827 (2020) (internal quotation marks and citations omitted).

As explained below, we conclude that the heightened standard announced in *Mansor II* does not apply and that the April warrants were not overbroad because "the facts, as set forth in the affidavit, along with any reasonable inferences, *** 'permit[ted] a neutral and detached magistrate to determine that seizable evidence probably would be found at the place to be searched.'" *State v. Soto-Sarabia*, 333 Or App 46, 50, 551 P3d 980, *rev den*, 372 Or 813 (2024) (setting forth standard for probable cause). We further conclude that the warrants were sufficiently specific because they allowed an officer, "with reasonable effort, to identify the place to be searched and the items to be seized." *State v. Goode*, 335 Or App 108, 116, 557 P3d 1132 (2024), *rev den*, 373 Or 280 (2025).

    1.   *The applicable legal standard*

We begin with the threshold question, namely, the legal standard that guides our analysis of defendant's claim that the April warrants were insufficiently particular. As to that requirement, defendant contends that the heightened standard set out in *Mansor II* applies because the state sought records that involved digital data. In his view, the records from Pinger and TextNow are the "functional equivalent of tangible flip phones," triggering the heightened particularity standard announced in *Mansor II*. The state, in contrast, argues that that heightened standard does not apply to the type of data at issue here, which is a limited category of digital information retained by a third-party service provider that is not analogous to cellphones and personal computers. We agree with the state.

*Mansor II* involved a warranted search and seizure of defendant's personal computer. Given the "unique characteristics of a personal computer," the court concluded that a heightened particularity requirement was necessary for warrants seeking information on personal electronic devices. 363 Or at 205, 218. In concluding that warrants for personal electronic devices require a heightened particularity standard, the court drew on the analysis in *Riley v. California*, 573 US 373, 134 S Ct 2473, 189 L Ed 2d 430

(2014), a case involving the question whether officers could search cell phones incident to arrest, *i.e.*, without a warrant. *Id*. at 200. In *Riley*, the Court "identified the several ways in which cell phones 'differ in both a quantitative and a qualitative sense' from other objects that might be found on an arrestee's person," including "many of those characteristics [that] also describe defendant's computer here." *Id*. at 201 (quoting *Riley*, 573 US at 375). Cell phones contain photographs, picture messages, text messages, internet browsing history, a calendar, a phone book, "and so on." *Riley*, 573 US at 394. The "immense storage capacity" of cell phones means that "[t]he sum of an individual's private life can be reconstructed through a thousand photographs labeled with dates, locations, and descriptions; the same cannot be said of a photograph or two of loved ones tucked into a wallet." *Id*. at 393-94. Further, cell phones collect "many distinct types of information—an address, a note, a prescription, a bank statement, a video—that reveal much more in combination than any isolated record." *Id*. at 394. And the internet history of cell phones can reveal "an individual's private interests or concerns"; location data can show where a person has been; and apps on a phone may provide a vast array of personal information. *Id*. at 395. The Court thus observed that treating a cell phone like a house is insufficient to protect the privacy interests that many individuals have in the information stored in their phones:

> "[A] cell phone search would typically expose to the government far *more* than the most exhaustive search of a house: A phone not only contains in digital form many sensitive records previously found in the home; it also contains a broad array of private information never found in a home in any form—unless the phone is."

*Id*. at 396-97 (emphasis in original).

In light of *Riley's* description of the vast amount of information that could be found on personal cell phones, the *Mansor II* court concluded that "the fact that police have a warrant, based on probable cause, to search for and seize 'things,' including computers, does not necessarily mean that they may conduct a comprehensive forensic examination of a computer that they seize, and then use at trial anything

they find on the computer, without limit. 363 Or at 208. To so hold would disregard the fact that "a computer or other digital device is a repository with a historically unprecedented capacity to collect and store a diverse and vast array of personal information." *Id*. Thus, to meet the particularity requirement of Article I, section 9, a warrant authorizing the search of digital devices "must identify, as specifically as reasonably possible in the circumstances, the information to be searched for, including, if relevant and available, the time period during which that information was created, accessed, or otherwise used." *Id*. at 218. That standard requires more than the typical particularity requirement, which requires that the warrant particularly describe the place to be searched, and the person or thing to be seized, and "allow the executing officer to identify with reasonable effort the things to be seized for which a magistrate has found probable cause." *Hargrove*, 327 Or App at 442-43.

Turning to the warrants at issue here, they seek a particular category of digital data, namely, TextNow and Pinger's records for defendant's accounts. But simply because the warrants seek digital information does not mean that *Mansor II's* heightened standard applies. Rather, *Mansor II's* reformulation of the particularity requirement hinged on the nature of the personal computer at issue there, a device that—much like the cell phones addressed in *Riley*—may contain vast amounts of personal information. The records at issue here—text messages maintained by a third-party service provider—do not implicate the "'unprecedented capacity' of electronic devices to 'collect and store a diverse and vast array of personal information' as identified in *Mansor* [*II*]." *Hargrove*, 327 Or App at 451 (quoting *Mansor II*, 363 Or at 208). To be sure, there may be some records maintained by a third-party service provider that store a "diverse and vast array of personal information." *Mansor II*, 363 Or at 208. But there is no evidence that the records here are tantamount to the personal electronic devices at issue in *Mansor II*; to the contrary, the record shows that the warrants sought limited types of records, *i.e.*, the text message and phone call records, and a list of contacts. Stated slightly differently, unlike the devices at issue in *Mansor II* and *Riley*—devices that could contain the

defendant's photographs, picture messages, text messages, internet browsing history, a calendar, a phone book, banking records, and more—the records sought here contained a narrow, specific category of digital data. We thus decline to extend *Mansor II* to this more limited situation.

### 2. *Overbreadth*

Having determined that the heightened standard announced in *Mansor II* does not apply, we assess the validity of the April warrants under the standard framework, *i.e.*, "whether the warrant[] describe[s], with particularity, the place to be searched and the persons or things to be seized and whether the warrant was supported by probable cause." *Goode*, 335 Or App at 111 (internal quotation marks omitted). Under that standard, we begin with defendant's arguments that the warrants were overbroad, *i.e.*, that they authorized a search that was "'broader than the supporting affidavit supplies probable cause to justify.'" *Mansor II*, 363 Or at 212; *see State v. Cannon*, 299 Or App 616, 626, 450 P3d 567 (2019) ("[T]he gravamen of an overbreadth challenge is an asserted lack of probable cause ***." (Internal quotation marks omitted.)).

First, defendant argues that the April warrants were overbroad because "the affidavit contains no information that TextNow or Pinger possessed [or] retained the content of a user's communications on their respective servers," and thus the warrants' authorization to search for and seize the "[c]ontent of all *** messages, as well as any phone calls," was not supported by probable cause. Under our standard of review, where "we allow all inferences that the issuing court may have fairly drawn from the facts in the affidavit," we conclude that defendant has not met his burden to show that the warrant was unlawful. *Soto-Sarabia*, 333 Or App at 48 (setting forth standard of review).

To be sure, as defendant argues, the affidavit did not explicitly state that Pinger and TextNow typically retain the *content* of a user's communications. However, defendant's argument—that the affidavit would establish probable cause to search the records *only* if it explicitly stated that the providers retain the content of communications—is inconsistent

with our standard of review and case law, which allow for reasonable inferences drawn from the affidavit when the affidavit is read in a "commonsense, nontechnical and realistic fashion * * *." *State v. Wilson*, 178 Or App 163, 167, 35 P3d 1111 (2001) (internal quotation marks omitted). Here, the affidavit included information that Givens sent preservation requests to Pinger and TextNow and that those providers typically retain "transactional information," beginning with specific information such as "length of service" and "records of log-in * * * times and durations," and ending with the broad category of "other log files that reflect usage of the account." Construing the affidavit "in a commonsense, nontechnical and realistic fashion," the affidavit permitted a reasonable inference that Pinger and TextNow retain various types of records and that those records would, more likely than not, include the content of defendant's communications. *Id.*

Next, defendant argues that the April warrants were overbroad because they did not limit the search to information related only to A and only to the two-day timeframe when A communicated with Karra and Johnny. Because the affidavit established probable cause that evidence unrelated to A would be found in the specified locations (including the sexually explicit photo of a minor that defendant sent to A, which, we note, defendant does not address in his argument), we conclude that defendant did not meet his burden of proving the unlawfulness of the warranted searches.

That conclusion is informed by our analysis in *State v. Rose*, 264 Or App 95, 330 P3d 680, *rev den*, 356 Or 400 (2014). In that case, the defendant challenged the trial court's denial of his motion to suppress evidence obtained pursuant to a warrant to search his Yahoo email account. *Rose*, 264 Or App at 97. The supporting affidavit stated that, in June 2010, the victim, a 16-year-old girl, emailed the defendant two photographs of her bare chest. *Id.* In July 2010, the victim told a detective that she had been communicating with the defendant over the last few months online, including via emails, and that they had "discussed sexually explicit details." *Id.* at 98.

The detective applied for a warrant, stating that there was probable cause to believe that evidence of the

crime of using a child in display of sexually explicit conduct and encouraging child sexual abuse would be found in the defendant's Yahoo account. *Id.* A magistrate issued the warrant, which authorized officers to search and seize user information and all of the defendant's emails, without limiting the search to any timeframe or to communications related only to the victim. *Id.* The defendant moved to suppress the evidence obtained pursuant to the warrant, arguing that, among other things, it was insufficiently particular. *Id.* at 99. The trial court denied the defendant's motion. *Id.*

The defendant appealed, renewing his argument that the warrant was insufficiently particular—namely, that it was overbroad—because, "despite the fact that the officer knew that the alleged photographs of the victim were sent in June or July of 2010," the warrant authorized a search of all of the defendant's emails stored on his Yahoo account. *Id.* at 106. We affirmed, concluding that the warrant was not overbroad because the two photographs referred to in the affidavit "[were] not the only evidence of [the] crimes that could exist in defendant's Yahoo account." *Id.* at 109. In addition to the information about the two photographs, the affidavit included the victim's statement that she and the defendant had "discussed sexually explicit details" online over the last few months, which indicated that "possible evidence of [the] defendant's crimes, aside from the two photographs, *** were being stored *** in his email account." *Id.*

Here, defendant makes a similarly narrow overbreadth argument—that despite the fact that officers knew that A communicated with the user of the Pinger and TextNow accounts only during a two-day period, the April warrants authorized a search for information unrelated to A and broader than the two-day period, and thus the warrants were overbroad. However, similar to *Rose*, where the two photographs referred to in the affidavit were not the only evidence of the crimes that could exist in the defendant's Yahoo account, A's communications during the two-day period are not the only evidence for which the affidavit in this case established probable cause to search for in the Pinger and TextNow records.

The affidavit included the following facts: Karra contacted A through YUBO; asked A for her phone number and began texting A from a Pinger account; sent A a sexually explicit image of a minor (the photograph of "Karra's" breasts); requested a sexually explicit photograph from A, which A then sent; and quickly introduced A to Johnny and asked A to have phone sex with Johnny; and then Johnny sent A sexually explicit messages from a TextNow account; and Johnny's TextNow phone number was associated with "Karra's" YUBO account.

The affidavit also included information based on Givens's training and experience that "suspects with a sexual interest in minor females may create personas of female minors in order to meet and befriend female minors online [and] then may use that minor persona to introduce the victim to an adult persona," and that suspects "who produce, receive and attempt to receive child pornography may collect sexually explicit *** materials in a variety of media, *** [and] may use these materials to lower the inhibitions of children they are attempting to seduce ***." *See State v. Goodman*, 328 Or 318, 328, 975 P2d 458 (1999) (facts derived from training and experience may contribute the necessary factual nexus in a determination of probable cause if the expertise is connected to objective facts derived from other sources).

That training and experience connected to the facts of this case—specifically that (1) Johnny's phone number was connected to the YUBO account, where Karra, a purported 13-year-old girl, first contacted A; (2) the initial contact on YUBO was quickly followed by an exchange of sexually explicit photographs over the Pinger account, including a sexually explicit photograph of a minor who was not A (the photo of "Karra's" breasts); and (3) Johnny then immediately sent sexually explicit messages from the TextNow account—provides the necessary factual nexus in the determination of probable cause. In other words, the affidavit established probable cause to believe that defendant targeted A through the YUBO, Pinger, and TextNow accounts, and the fact that defendant possessed a sexually explicit photo of a different minor female allowed a reasonable inference that defendant had targeted at least one other victim. *See State v. Anspach*,

298 Or 375, 381, 692 P2d 602 (1984) (to determine proba-
ble cause, the magistrate may rely on facts asserted in the
affidavit as well as reasonable inferences to be drawn from
them); *State v. Daniels*, 234 Or App 533, 538-41, 228 P3d
695, *rev den*, 349 Or 171 (2010) (objective fact that the defen-
dant had tried unsuccessfully to videotape an act of sexual
abuse 20 years earlier, combined with the officer's knowledge
from training and experience that pedophiles own and often
retain "deviant" movies, was sufficient to establish proba-
ble cause that videotape evidence of sexual abuse would be
found in the defendant's home).

Thus, just as we did in *Rose*, where we disagreed
with the defendant's argument that the warrant was over-
broad because it was not limited to the two photographs
sent to the defendant by the victim, we disagree with defen-
dant's argument here that the April warrants were over-
broad because they were not limited to A's communications
with Karra and Johnny. In *Rose*, the victim's statement in
the affidavit that she and the defendant had discussed sexu-
ally explicit details in previous emails established probable
cause to search for evidence beyond the two photographs.
Here, the objective facts—particularly the photo of a dif-
ferent victim and the connection between Karra's YUBO
account and Johnny's TextNow number—combined with
the affiant's training and experience, established probable
cause to search for evidence beyond just A's communications
with Karra and Johnny. In reaching that conclusion, we
note that the warrant we upheld in *Rose* did not limit the
search to any timeframe and thus in fact was broader than
the warrants in this case.

### 3. *Specificity*

Having concluded that the April warrants were not
overbroad, we next address defendant's argument that the
warrants were impermissibly nonspecific. In support of that
argument, defendant relies on *State v. Bock (A169480)*, 310
Or App 329, 485 P3d 931 (2021), which involved the search
of the defendant's cell phone. As discussed above, however,
the heightened particularity standard that applied to that
search does not apply to the third-party record searches
here. Thus, our inquiry is limited to whether the warrant

was "specific enough to allow an officer, with reasonable effort, to identify the place to be searched and the items to be seized." *Goode*, 335 Or App at 116.

Applying that standard in *Rose*, we concluded that the warrant was sufficiently specific because it "identified the place to be searched—defendant's Yahoo account—and the thing to be searched for and seized—evidence of the crimes of using a child in a display of sexually explicit conduct and of encouraging child sexual abuse." 264 Or App at 108. The warrants here are similarly specific. They identified the places to be searched—the records of defendant's Pinger and TextNow accounts—and the items to be searched for and seized—evidence of the crimes of communication with a minor for immoral purposes and sexual exploitation of a minor, including the content of all text messages and phone calls, "all user profile information," and "any information" regarding "account registration/recovery purposes." When read with the affidavit, which included information that defendant had targeted A through text messages and phone calls, and may have targeted at least one other victim, the warrant permitted the executing officer, using reasonable effort, to identify the items to be seized—namely, sexually explicit communications and photographs involving minors, and evidence identifying the user of the accounts. Thus, as we did in *Rose*, we conclude that the warrants were sufficiently specific because they were "limited to a particular location, and the description of the items to be seized left the officers with no discretion in the matter." *Id*. at 109.

In sum, defendant has not carried his burden to show that the April warrants were overbroad or insufficiently specific. Accordingly, the trial court did not err in denying defendant's motions to suppress evidence obtained pursuant to those warrants.

B.  *May 2020 Warrants to Search the Pinger and TextNow Files*

We turn to the May 2020 Pinger and TextNow warrants. As mentioned above, Vancouver law enforcement forwarded the Pinger and TextNow files to the Linn County Sheriff's department. Detective Trenary opened the files to

look for evidence related to the incident with A, and after discovering texts and images that involved victims other than A, Trenary sought warrants to search the Pinger and TextNow files that he had received from Vancouver law enforcement. A Linn County magistrate issued the warrants after finding that there was probable cause to believe that "evidence of the crimes of Using a Child in a Display of Sexually Explicit Conduct, Encouraging Child Sexual Abuse I, and Luring a Minor" would be found in the files.

Defendant filed motions to suppress evidence obtained pursuant to the warrants, arguing that they were "general warrants" and unsupported by probable cause. The trial court denied defendant's motions. Defendant assigns error to that ruling, renewing the arguments that he made below. Defendant further argues that the "use of nonresponsive data in the [April] warrants to procure the [May] warrants was unlawful." The state responds that Trenary did not need additional warrants to search the Pinger and TextNow files that had been lawfully obtained pursuant to the April warrants.

We agree with the state. Article I, section 9, "protects both possessory and privacy interests in effects," *State v. Munro*, 339 Or 545, 551, 124 P3d 1221 (2005), and a "search" occurs when an individual's protected privacy interests are invaded, *State v. Howard/Dawson*, 342 Or 635, 640, 157 P3d 1189 (2007). As explained above, the April warrants, which authorized the seizure of the Pinger and TextNow files, were valid. Thus, Trenary was lawfully in possession of the files under the authority of the April warrants, and "defendant had no remaining privacy interest in the [files'] contents at the time of the search." *Munro*, 339 Or at 553 (where police seized a videotape pursuant to a lawful warrant authorizing the search and seizure of drug-related evidence, the defendant lost any privacy interest in the videotape's contents; thus, a subsequent search of the videotape for child pornography was lawful).[3]

---

[3] We note that *Munro* applies here because the seized evidence—third-party records of text messages and call history—is not subject to the heightened particularity standard outlined in *Mansor II*. *See* 363 Or at 209-10 (rejecting state's argument that, under *Munro*, the defendant retained no privacy interest in his computer that police seized pursuant to a warrant because devices such as

C.  *May 2020 Warrant to Search Defendant's Person and Digital Devices*

  Next, we address the May 2020 warrant that authorized officers to search defendant's person and seize and search any digital devices found on defendant's person. In the affidavit in support of the warrant, Trenary recounted the facts from the Vancouver investigation, as detailed above, including Karra's text to A that she wants A to have "phone sex" with Johnny, and Johnny's text to A that "I'll do anything to talk on the phone with you." The affidavit also included additional facts from a subsequent investigation conducted by Oregon law enforcement. Those additional facts included that an officer conducted surveillance on defendant and observed defendant talking on a cell phone while sitting in his car after leaving his place of employment. Additionally, defendant had been arrested in California in 2010 for Lewd or Lascivious Acts with a Child under 14 and Arrange Meeting with Minor. The police report that documented the investigation included information that defendant, using the "Johnny" persona, texted with a 12-year-old girl, met with the girl, and sexually assaulted her. Those charges were dismissed, and defendant was convicted of Disorderly Conduct: Soliciting Lewd Act (misdemeanor) and sentenced to one day in jail.

  Trenary also included information that he obtained after opening the Pinger and TextNow files that he received from Vancouver law enforcement. In one of the TextNow files, Trenary "noted [it] contained rows of information in columns titled 'Call Start Time,' 'Duration,' 'Caller,' and 'Called Number.' The information listed appeared to be a record of calls sent or received to the number *** 7417 (the 'Johnny' persona)." Trenary applied a filter to the records to search for calls with the number that A used, and "noted ten entries appearing in either the 'Caller' or the 'Called Number' columns," with the first call record timestamped March 12, 2020, and the last record timestamped March 13, 2020.

  Also, in one of the TextNow files, the following texts were sent from the number that Johnny used to a number that was not the one A used: "I needed to make love to you,"

computers and cell phones "contain[] many types of information, hav[e] immense storage capacity, and play[] a role in many aspects of life.").

"Could I finger you," and "Baby I'm jacking off thinking about u." One of the Pinger files contained a message sent from a number that was not the number A used that said, "U just told a fucking little girl u r gunna have her cumming when you fuck her."

The affidavit also included information about Trenary's training and experience, and his knowledge based on that training and experience, including knowledge about digital devices, digital service providers, digital data, and persons who commit online child exploitation offenses. Based on his training and experience, Trenary knows that "Voice over Internet Protocol (VoIP) phone numbers such as those offered by TextNow and Pinger are frequently utilized by online child exploitation suspects *** [and] are readily available both from a browser in a computer or through a free application available for most smart phones." Further, Trenary knows that "through the normal use of a digital device, *** the operating system, software, and applications all create data [that] details how the user is interacting with the device and with different software and applications. *** This information can *** reveal indications of ownership, use, and/or dominion of control over the device to show the identity of the person at the time and place any evidentiary information is located."

Based on the information in the affidavit, Trenary averred that he had "probable cause to believe that evidence of [the crimes of Using a Child in a Display of Sexually Explicit Conduct, Encouraging Child Sexual Abuse I, and Luring a Minor] may be found on digital devices owned by [defendant] or accessible to [defendant] to include devices *** on his person." A magistrate issued a warrant that authorized officers to search for and seize items from defendant's person, including digital devices capable of network communication and data storage. The warrant further authorized officers to search the digital devices for the following:

"[1].  Information related to the online sexual exploitation of [A]

"[2].  Information related to any exchange of information related to the phone number of [A's mother]

"[3].   Information related to digital imagery depicting suspected child sexual abuse, to include visual depictions of child sexual abuse

"[4].   Identification and communication information indicative of co-conspirators, alternate personas used in the commission of the offense, or additional victims of online child sexual exploitation offenses.

"[5].   If *** any of the above described evidentiary information is identified residing in the data storage of a digital device seized and analyzed pursuant to this warrant, then the following information will also be searched for:

   "a.   Information related to the ownership, access, use, or control of the identified digital device."

Detectives executed the warrant and seized a cell phone from defendant. Pursuant to the commands to search the cell phone, officers discovered social media and communication applications, including Yubo, TextNow, and Pinger/TextFree. In those applications, officers discovered the messages and photos that defendant exchanged with A, as well as sexually explicit text messages and sexually explicit images of children associated with other phone numbers.

As noted, defendant filed a motion to suppress evidence obtained from his person and digital device, arguing that the warrant was unsupported by probable cause and that it was insufficiently particular under Article I, section 9. Although defendant challenged each search command before the trial court, on appeal he challenges only the second, third, and fifth commands, and thus we focus on the arguments defendant made to the trial court as to those commands.

Beginning with defendant's probable cause argument, he contended that the affidavit did not establish probable cause to search defendant or his cell phone because the IP address associated with the text messages was linked to defendant's residence, the affidavit did not connect the IP address to a particular device, and the affidavit did not "lead to a nonspeculative inference that a cell phone (as opposed to a tablet, laptop, desktop, or any other digital device) was used to facilitate the exchange of contraband messages."

As to defendant's particularity argument, he argued generally that the commands were overbroad and impermissibly nonspecific. Beginning with the second command, defendant argued that it "permit[ted] officers to look anywhere in the phone for any exchange of information." As to the third command, defendant argued that it "authorized police to rummage through the entire phone on a quest to [discover] additional criminal activity that is not mentioned in the affidavit * * *." Finally, defendant argued that the fifth command was impermissible under *Bock*. 310 Or App at 335 (command to search cell phone for "[a]ny evidence identifying the owner/user of the device" violated the particularity requirement because "the officer performing the search has the discretion to rummage freely throughout the device and seize nearly everything * * *.").

The state argued that the search was lawful because defendant consented to the search of his phone. The state argued, alternatively, that the affidavit established probable cause and that the warrant commands were sufficiently particular. With respect to the fifth command, the state argued that the language is narrowly tailored, and it is "further constrained by the fact that it is activated only upon the occurrence of a specific contingency. This command * * * [can] only be utilized if evidence sought under the preceding commands yielded the expected contraband. If the preceding commands are narrow, then this too is narrow."

At a hearing on defendant's motion to suppress, Trenary testified about the execution of the warrant. Trenary and detective Miller, who were dressed in plain clothes, contacted defendant at his workplace and asked to speak with him. Trenary "Mirandized [defendant], patted him down, read the search warrant, * * * and then we moved into the car to have our conversation," which Trenary described as "pretty cordial." Trenary seized defendant's cell phone during the pat down. The conversation, which took about two hours, occurred in Trenary's unmarked vehicle that was parked in the parking lot of defendant's workplace. Defendant, who was not handcuffed, sat in the passenger seat, Trenary sat in the driver's seat, and Miller sat in

the back seat. There was no "display of weaponry," and no threats or physical force.

Trenary asked defendant about the passcodes for his phone, and after defendant mentioned three different passcodes, Trenary said "I just want to make sure that we actually have the correct one. I want to be able to do what we need to do with the phone with as minimal intrusion as we possibly can." Miller checked each passcode and one of the codes "did in fact work."

Trenary asked defendant some questions about Yubo and TextNow, then asked him:

"[TRENARY]:   So on your phone, on your laptop and stuff like that how much imagery whether it's videos or pictures are we going to find that depicts kids *** that's sexual in nature, like explicit images?

"[DEFENDANT]:   On my laptop zero, *** none of the devices at home. On this phone I don't save anything to the—the gallery or anything like that so *** if there was stuff saved into the—the text itself it would just be that.

"[TRENARY]:   It sounds like you don't care if we look at or analyze any of your phone—

"[DEFENDANT]:   Yeah.

"[TRENARY]:   Your phone's cool to look at.

"[DEFENDANT]:   Yeah. You already know what's on it.

"[TRENARY]:   Well, yeah. I know, but do you understand like why I ask that question? Like I would—just me as a human being I would want to be afforded the same courtesy.

"[DEFENDANT]:   Right."

Trenary then showed defendant a consent form and told him he was not "under any obligation to sign this," to which defendant replied, "Okay." Trenary then explained that "the search warrant that I read to you covers *** digital devices seized from your person ***." Trenary told defendant that another detective was "currently writing another search warrant" for defendant's residence and that that warrant would authorize a search for "digital devices, notes,

passwords, that kind of stuff" and would also authorize offi-
cers to analyze those devices. Trenary then said:

> "[TRENARY]:   I like to give people the respect of say-
> ing 'Can I also have your consent to * * * analyze those dig-
> ital devices that we find.
>
> "[DEFENDANT]:   Right.
>
> "[TRENARY]:   It's nothing that you have to give me.
> You can say 'No, you don't have my consent' and that would
> be fine. I'm not going to get mad about that, but I think
> it's—to me just as a human being to another human being
> it's a respectful thing to do.
>
> "[DEFENDANT]:   Right.
>
> "[TRENARY]:   [R]ather than tromp through like I own
> the place. Do you know what I mean?
>
> "[DEFENDANT]:   Yeah.
>
> "[TRENARY]:   And by the place I mean your phone,
> * * * your Nintendo switch, your computer up at the house,
> your daughter's old phone, like that kind of stuff.
>
> "[DEFENDANT]:   Mm-hmm.
>
> "[TRENARY]:   Okay. You can say no. Is giving me con-
> sent to analyze those devices something that you want to
> do?"

Defendant responded by asking Trenary if he could
ask him a question, and Trenary said yes. Defendant said,
"I can take and give you everything that I own, I don't really
care," but he explained that the owner of the land where
defendant's residence is located is "very particular about who
he lets on the property." Defendant was concerned that the
landowner would see the police on the property and then not
want defendant to live on the property anymore. Defendant
said, "I don't care if you guys take my computer and tear it
into little tiny pieces or whatever, I don't care if you take
whatever. I just need a place for my family to live." Trenary
replied, "I'm not intending to damage any of your digital
devices, by the way, * * * that's an expensive phone * * *
I'm not planning on damaging it at all, okay?" Defendant
replied, "Yeah. Okay." Trenary testified that defendant did
not sign the consent form, not because he refused to sign,

but because they "moved on and it was my failure to circle back to that form because we're now talking about the property and how to access the property."

Trenary also testified about the search commands in the warrant. Specifically, with respect to the fifth command, which authorized officers to search for "[i]nformation related to the ownership, access, use, or control" of the phone on the condition that officers located evidence pursuant to the other commands, Trenary testified that "only after identifying evidence am I then able to go to [the fifth command] of looking for *** who's behind the keyboard." He further explained that "[w]ith something like the Pinger and TextNow information that's pretty limited to just the account. The subscriber information is all it's going to be limited to." As to defendant's phone, Trenary explained, "it's going to be things like the phone number, *** any information about what Google account is assigned to the device, other kinds of identifying information like that ***."

After Trenary testified, defendant renewed the arguments that he made in his motion to suppress—that the affidavit did not establish probable cause and that the search commands were overbroad and insufficiently specific. Defendant also argued that he did not voluntarily consent to the search because he "was told a search is going to happen no matter what and he tells the officer 'You already know what's in there.' That at best is mere acquiescence." The state renewed its arguments that defendant consented to the search of his phone and that, alternatively, the warrant was lawful. With respect to the fifth command, the state argued that "if [the executing officer] found say the contraband image in TextNow or Pinger then that would *** authorize [the officer] to look for information regarding the access, use, and control of the identified Pinger account."

The trial court denied defendant's motion after concluding that the warrant was supported by probable cause and sufficiently particular under *Mansor II*. As to the fifth command, the court noted that it "authoriz[ed] [officers] to find out who was the person who was actually *** engaging in the criminal conduct" and that Trenary "carried out his search by a step-by-step process before he even tried to

ascertain who was the one who was in charge of or responsible for downloading the information." With respect to the state's argument about whether defendant voluntarily consented to the search, the trial court first found that "the search warrant was not overbroad and that [it] was lawfully ordered." The court then noted that defendant "was very explicit in that his only concern was not in the privacy interest in his property, even going so far as to say 'I don't care if you chop up that computer into pieces.' He was more concerned about 'I don't want to get evicted.'"

On appeal, defendant assigns error to the trial court's ruling. Defendant renews his arguments that the warrant was unsupported by probable cause and that the second, third, and fifth commands were insufficiently particular.[4] The state argues that the search was lawful because defendant voluntarily consented, or, alternatively, that the warrant was supported by probable cause and did not violate the particularity requirement.

We begin with the state's argument that defendant voluntarily consented to the search of his phone. *See State v. Tennant*, 310 Or App 70, 75, 483 P3d 1226 (2021) ("A warrantless search violates Article I, section 9, unless it is justified by an exception to the warrant requirement; consent is such an exception."). In determining whether a defendant voluntarily consented to a search, we consider whether, "under the totality of the circumstances, the consent was given by an act of free will or was the result of coercion, express or implied." *State v. Moore*, 354 Or 493, 505, 318 P3d 1133 (2013), *adh'd to as modified on recons*, 354 Or 835, 322 P3d 486 (2014). "A defendant's 'mere acquiescence' to police authority does not constitute consent." *Tennant*, 310 Or App at 75. In assessing whether a defendant consented or merely acquiesced, we look to the totality of the circumstances. *Id*. at 76. We are bound by the trial court's findings of fact if there is evidence in the record to support them, but, ultimately, whether consent was voluntary is a question of law. *Moore*, 354 Or at 505.

---

[4] Defendant also argues that the "use of nonresponsive data in the [April] warrants to procure the warrant[] was unlawful." As explained above, however, the April warrants lawfully authorized officers to search the records for evidence related to crimes involving the sexual exploitation of children, and thus the text messages were responsive to the warrants.

Here, Trenary asked defendant for consent to search his phone, and defendant made statements such as "I can * * * give you everything that I own, I don't really care," and "I don't care if you take whatever." However, before that conversation, Trenary had Mirandized defendant, read him the search warrant, seized defendant's cell phone, and asked defendant for his passcode "to be able to do what we need to do with the phone." We conclude that, under those circumstances, it would have been clear to defendant that a search would occur regardless of whether consent was given, and thus defendant did not consent but rather merely acquiesced to the search. *Id*. at 76 ("[I]n assessing consent versus mere acquiescence, we view the situation from the perspective of the person being asked for consent * * *.").

We next address whether the search was lawful pursuant to the warrant, beginning with defendant's argument that the warrant was unsupported by probable cause. Article I, section 9, provides, in part, that "no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized." Probable cause exists "when the facts set out in the affidavit, along with any reasonable inferences, permit a neutral and detached magistrate to determine that seizable evidence will probably be found in the location to be searched." *State v. Hernandez*, 308 Or App 783, 789, 481 P3d 959 (2021). The standard of probability "requires more than a mere possibility, but less than a certainty." *Id*. (internal quotation marks omitted).

Defendant argues that the affidavit did not "establish[] any nexus that a digital device on defendant's person would contain crime evidence." *See State v. Nelson*, 307 Or App 226, 233, 476 P3d 100 (2020) (probable cause "exists only if the affidavit sets forth facts that create a nexus between the place to be searched and the objects to be found" (internal quotation marks omitted)). "[C]ognizant of the preference for warrants and our concomitant duty to resolve doubtful or marginal cases in favor of that preference," we disagree and conclude that defendant did not meet his burden to show that the warrant lacked probable cause. *State v. Webber*, 281 Or App 342, 358, 383 P3d 951

(2016). The affidavit included the following information: the TextNow records contained "ten entries [involving A's phone number] appearing in either the 'Caller' or the 'Called Number' columns"; Johnny texted A that "I'll do anything to talk on the phone with you"; Karra texted A that she wants A to have "phone sex" with Johnny; "phone numbers such as those offered by TextNow and Pinger are * * * readily available both from a browser in a computer or through a free application available for most smart phones"; and an officer observed defendant talking on a cell phone while sitting in his car. Although the affidavit did not identify a specific digital device that was used to commit the crimes, the facts in the affidavit allowed a reasonable inference that defendant possessed a cell phone and that he used that cell phone at his home to text and call A. Thus, the affidavit "permit[ted] a neutral and detached magistrate to determine that seizable evidence probably would be found" in defendant's cell phone. *Soto-Sarabia*, 333 Or App at 50 (internal quotation marks omitted); *cf. Cannon*, 299 Or App at 632 (affidavit did not establish probable cause to search electronic devices in part because it failed to establish that defendant even owned any of the devices indicated in the warrant).

Turning to defendant's argument that the second, third, and fifth search commands were insufficiently particular, we determine whether the warrant identified, "as specifically as reasonably possible in the circumstances, the information to be searched for, including, if available and relevant, the time period during which the information was created, accessed, or otherwise used." *Mansor II*, 363 Or at 187-88 (setting forth the heightened particularity standard for warrants to search computers or other digital devices).

Beginning with the second command—"[i]nformation related to any exchange of information related to the phone number [that A used]"—defendant argues that it is overbroad because it contained "no temporal or subject matter limitations." We note that, although defendant argues that the command is overbroad rather than insufficiently specific, those concepts often overlap, and we understand defendant to argue that the command is overbroad because it is insufficiently specific.

We conclude that, when read in conjunction with the affidavit, the search command is sufficiently specific. *See State v. Vesa*, 324 Or App 674, 683, 527 P3d 786 (2023) (determining whether the affidavit "provided the necessary specificity" after observing that "the warrant to search [the] defendant's cellphone must be read in conjunction with [the] affidavit"). First, although the command lacked a temporal limitation, it was limited to information related only to A's phone number, and the affidavit included information that defendant had communicated with A over a two-day period. Thus, the search was effectively limited to the relevant timeframe. *See State v. Meyers*, 338 Or App 59, 71, 565 P3d 463 (2025) (command to search the defendant's cell phone for "[d]igital photographs related to [defendant's phone numbers] and digital images sent to [the undercover phone number]" was sufficiently specific notwithstanding the absence of a temporal limitation because the command was limited to the relevant phone numbers and the affidavit included the dates that the defendant communicated with the undercover phone number).

Second, as to defendant's argument that the command was impermissibly nonspecific because it lacked "subject matter limitations," we understand defendant to argue that it did not sufficiently specify the *type* of information officers were authorized to search for. Although the command does not define "information," the affidavit established that defendant had sent sexually explicit text messages and exchanged sexually explicit photographs with A using Pinger and TextNow. Those facts, combined with the crimes identified in the warrant, sufficiently limited the search such that it permitted "law enforcement, exercising reasonable effort, to identify the information sought with a reasonable degree of certainty." *State v. Turay*, 371 Or 128, 149-50, 532 P3d 57 (2023). In other words, the warrant—limited by the affidavit—identified with specificity what the evidence was, namely texts and photographs involving A's phone number. *See Mansor*, 363 Or at 219 (warrant that contained no instructions or limitations regarding how the computers were to be analyzed was sufficiently particular where the affidavit "sufficiently described the 'what' to be searched for and the relevant time frame").

As to the third command—"[i]nformation related to digital imagery depicting suspected child sexual abuse, to include visual depictions of child sexual abuse"—defendant summarily argues that "a warrant authorizing a search for all 'evidence of a particular crime' is not sufficiently specific." *See Mansor*, 363 Or at 213-14 (a warrant authorizing the search of a computer for "evidence of a particular crime," without more, was not sufficiently specific).

Defendant is correct that "merely identifying the crime under investigation" does not, by itself, satisfy the particularity requirement. *Id.* at 214. The search command here, however, does not "merely identify the crime under investigation." Rather, it specifies the type of evidence executing officers should search for, including contraband that can be located on a cell phone—"visual depictions of child sexual abuse." *Cf. State v. Savath*, 298 Or App 495, 503, 447 P3d 1, *rev den*, 365 Or 722 (2019) (warrant was insufficiently particular in part because defendant's alleged criminal activities—controlled substance offenses—did not involve contraband that could be located on his cell phone); *cf. Bock (A169480)*, 310 Or App at 336 (command to search for evidence of various firearm offenses was insufficiently particular in part because "a firearm itself cannot be located on [the] defendant's cell phone"); *cf. Mansor*, 363 Or at 213 (a warrant that, without more, "identifies the crimes being investigated," is not sufficiently specific where crimes under investigation were criminal mistreatment and assault).

Further, as discussed above, the affidavit established probable cause to believe that defendant had created different personas to send, solicit, and receive sexually explicit photographs of minor females using TextNow and Pinger, and that he had targeted at least two victims. Defendant does not point to any relevant timeframe or other limitation that was available to police that could have been included in the warrant. *Turay*, 371 Or at 152-54 (warrant was insufficiently particular where it "omitted additional limiting factors that were known to law enforcement"). Under those circumstances, we conclude that the search command was sufficiently specific. *See State v. Paye*, 310 Or App 408, 415-17, 486 P3d 808 (2021) (command to search

the defendant's computer for "[a]ny and all evidence documenting the [crimes of promoting prostitution and compelling prostitution]," to include a broad array of information such as photographs and videos of the named victim and "as-of-yet unidentified females," satisfied the particularity requirement notwithstanding the lack of a temporal limitation; there was probable cause that the defendant was engaged in an ongoing enterprise, that evidence of that enterprise would be found on his computer, and "[t]here is no indication that specific relevant time frames pertaining to that ongoing activity were 'available to the police'").

Turning to the fifth command, which authorized officers to search for "[i]nformation related to the ownership, access, use, or control of the identified digital device" if the officers first identified evidence pursuant to the other commands, defendant argues that that command is invalid under *Bock*. In *Bock*, we concluded that a command to search the defendant's cell phone for "[a]ny evidence identifying the owner/user of the device" violated the particularity requirement. 310 Or App at 332, 334. We observed that a "warrant without clear limitations on the material subject to search and seizure requires the executing officer to employ discretion in deciding what to search or seize." *Id.*

The state argues that *Bock* is not controlling because, contrary to the search command in *Bock*, the command here was conditional and only applied if the officer first found evidence pursuant to the preceding commands. For his part, defendant does not acknowledge or address the effect, if any, of the conditional nature of the command. The state also argues that the command here is distinguishable from the one in *Bock* because it authorized a search for "information" rather than "any evidence" and, in the state's view, the term "information" is narrower than "any evidence."

In our view, the term "information" is not dispositively narrower than "any evidence," but we do agree with the state that the conditional phrase attached to the command—combined with the facts in the affidavit—distinguishes this case from *Bock*. The affidavit here contained Trenary's knowledge that, based on his training and experience, a digital device's "operating system, software, and

applications" create data that can show ownership, use, and control over the digital device and the identity of the person "at the time and place any evidentiary information is located." When read with the affidavit, the purpose of the conditional phrase is to tie the search for evidence of ownership, use, and control, to the evidence that was found on the phone. In other words, as the state argued before the trial court, if officers found evidence on Pinger, then the fifth search command would authorize officers to look for the identity of the person who accessed, used, and controlled the Pinger account in connection with that evidence.

Thus, we conclude that the command here is materially distinguishable from the command in *Bock* such that it is sufficiently specific—particularly in light of the principle that "[w]hen a search is warranted, a presumption of regularity arises, [and] therefore, the defendant bears the burden of proving the unlawfulness of a warranted search." *Goode*, 335 Or App at 116. The conditional phrase—which again, defendant does not address in his argument—when read with the affidavit, limits the search to information that would show the identity of the user in connection with the creation of the evidence that was located in the digital device pursuant to the previous commands. And, as discussed above, those commands are sufficiently specific. Within those parameters, the executing officer would know, exercising reasonable effort, what to search for and would not have the discretion to "rummage freely throughout the device and seize nearly everything ***." *Bock (A169480)*, 310 Or App at 335.

In sum, we conclude that the May 2020 warrants to search Pinger, TextNow, and defendant's person and cell phone were supported by probable cause and sufficiently particular, and the trial court correctly denied defendant's motions to suppress evidence obtained pursuant to those warrants.

## II.   MOTION TO DISMISS OR TO DEMUR TO THE INDICTMENT

In his seventh assignment of error, defendant contends that the trial court erred in denying his motion

to dismiss and in overruling his demurrer. Before trial, defendant filed a motion to "Dismiss and/or Demurrer" in which he argued that two of the statutes under which he was charged, ORS 163.670 and ORS 163.684, were unconstitutional. ORS 163.670,[5] which governs using a child in a display of sexually explicit conduct, prohibits anyone from "employ[ing], authoriz[ing], permit[ting], compel[ling] or induc[ing] a child to participate or engage in *sexually explicit conduct* for any person to observe or to record in a visual recording." ORS 163.684, which governs encouraging child sexual abuse, prohibits anyone from "develop[ing], duplicat[ing], publish[ing], print[ing], disseminat[ing], exchang[ing], display[ing], finance[ing], attempt[ing] to finance or sell[ing] a visual recording of *sexually explicit conduct* involving a child" when that person "knows or is aware of and consciously disregards the fact that creation of the visual recording of *sexually explicit conduct* involved child abuse" (emphasis added). The phrase "sexually explicit conduct," as it is used in both ORS 163.670 and ORS 163.684, is statutorily defined, in part, as the "actual or simulated *** [l]ewd exhibition of sexual or other intimate parts." ORS 163.665(3)(f). In defendant's view, "the legislature's definition of 'sexually explicit conduct' is constitutionally unenforceable under Article I, sections 8, 20, and 21" of the Oregon Constitution and under the First and Fourteenth Amendments to the United States Constitution because it creates "content-based restrictions" on expressive material and because it is vague and overbroad.

    The trial court concluded that ORS 163.670 and ORS 163.684 were constitutional and denied defendant's motion. On appeal, defendant renews his challenges to those statutes.

    We begin with defendant's state constitutional challenges, and, in particular, his argument under Article I, section 8. *See State v. Velykoretskykh*, 268 Or App 706, 707 n 2, 343 P3d 272 (2015) (stating that under the "'first things first'

_____

[5] ORS 163.670 was amended after defendant engaged in the conduct that is the subject of this appeal. However, because those amendments do not affect our analysis, we refer to the current version of the statute in this opinion. *See State v. Lasheski*, 309 Or App 140, 146 n 2, 481 P3d 966 (2021) (taking the same approach).

doctrine, we have an obligation to address state constitutional law claims before federal ones."). Defendant contends that both ORS 163.670 and ORS 163.684 violate Article I, section 8, because they are "focused on curtailing speech" and are "untethered" to any harm. *See State v. Robertson*, 293 Or 402, 649 P2d 569 (1982) (establishing the framework for Article I, section 8, challenges); *see also State v. Stoneman*, 323 Or 536, 543, 920 P2d 535 (1996) (explaining that under the framework established in *Robertson* and its progeny, the court analyzes Article I, section 8, challenges by first determining whether the statute is directed at the "substance of any opinion or any subject of communication"; if so, it is facially invalid unless it fits within a "historical exception" or is focused on a proscribed harm rather than the content of the communication (internal quotation marks omitted)). In response, the state contends that defendant's arguments are foreclosed by the Oregon Supreme Court's decision in *Stoneman*. We agree with the state.

In *Stoneman*, the Supreme Court rejected a similar challenge to a statute, *former* ORS 163.680 (1987), that prohibited the purchase of any "photograph, motion picture, videotape or other visual reproduction of *sexually explicit conduct* by a child." 323 Or at 539 (emphasis added). There, while applying the framework established in *Robertson*, the majority concluded that the statute did not violate Article I, section 8, because it was directed not to the communicative substance of the content, but to the harmful effects to children that necessarily follow from the production of that material. *Id*. at 550. In coming to that conclusion, the court reasoned that the statute at issue "prohibited the *purchase* of 'visual reproduction[s] of sexually explicit conduct by a child under 18 years of age,' not in terms of the content of those reproductions, but because they owe their very existence to the commission of sexual abuse of a child and are, consequently, an extension of that harmful act." *Id*. at 546 (quoting *former* ORS 163.680 (1987); emphasis and brackets in original).

The statutes here are directed to the same harmful effects identified in *Stoneman*. ORS 163.670 and ORS 163.684 prohibit compelling or financing the creation of certain communicative materials (*i.e.*, visual recordings of

sexually explicit conduct involving a child), not in terms of their communicative substance, but in terms of their status as a product of acts that have necessarily harmed children. The ability to create and disseminate such material is "made possible only by the sexual abuse of children, which is, of course, harmful to children." *State v. Ready*, 148 Or App 149, 160, 939 P2d 117, *rev den*, 326 Or 68 (1997).[6] As in *Stoneman*, the statutes here are directed at eliminating the underlying harm that child sexual abuse causes and, accordingly, do not violate Article I, section 8, of the Oregon Constitution. To the extent defendant contends that *Stoneman* was wrongly decided, we are not at liberty to disregard the Supreme Court's majority opinion. Unless and until the Supreme Court overrules *Stoneman*, it remains binding precedent.

In arguing for a contrary result, defendant contends that subsequent legislative changes to the definition of "sexually explicit conduct" have left *Stoneman* with "no continuing precedential effect." As defendant notes, before 1995, the definition of "sexually explicit conduct" in ORS 163.665(3)(f) included "lewd exhibition of the *genitals or anus*" (emphasis added). However, in 1995, the legislature amended that portion of the definition to "lewd exhibition of *sexual or other intimate parts*." ORS 163.665(3)(f) (1991), *amended by* Or Laws 1995, ch 768, § 4 (emphasis added). Defendant argues that the legislature's change broadened the scope of the statute to such a degree that *Stoneman* has no continuing validity. We disagree.

To begin, and as the state points out, although the defendant in *Stoneman* had been charged under an earlier version of the statute, the Supreme Court issued its opinion after the 1995 amendment and acknowledged that the

---

[6] This analysis does not address the use of artificial intelligence or other digital technologies to generate visual depictions of children who do not exist. The statutes at issue here are directed at a narrow category of visual materials that necessarily involve the participation of an actual child in the creation of the content. *See* ORS 163.665(3)(f) (defining the phrase "sexually explicit conduct," in part, as the "actual or simulated * * * [l]ewd exhibition of sexual or other intimate parts"); *see also Stoneman*, 323 Or at 540 (explaining that "simulated" exhibitions of sexually explicit conduct refers to sexual acts in which an actual child participates—"the child's participation in the act must be real, *i.e.*, the sexual *act* may be 'simulated,' but the child's participation in that act cannot be" (emphasis in original)).

amendment was immaterial to its opinion. 323 Or at 540 n 4 (stating that in 1995 the definition of "sexually explicit conduct" had been "amended in minor ways not relevant to this case"). Thus, the court's reasoning in *Stoneman* remains directly applicable, regardless of the subsequent statutory amendment.

Furthermore, nothing about that amendment brings into question the core of the court's reasoning in determining whether the statute at issue in *Stoneman* violated Article I, section 8. While applying the framework established in *Robertson*, the court reasoned that because the statute was focused on "harm to children," "rather than on the substance of the communication," the statute passed constitutional muster. *Id.* at 543-45. As the state argues, the 1995 amendment to the definition of "sexually explicit conduct" to replace "the anus or genitals" with "sexual or other intimate parts" does not alter that analysis. Nor does it change our conclusion that the statutes under which defendant was charged—ORS 163.670 and ORS 163.684—are similarly focused on harm to children and not speech. In sum, the 1995 amendment to the definition of "sexually explicit conduct" in ORS 163.665(3) (f) does not affect the continuing validity of *Stoneman* or its application to this case.

Next, we turn to defendant's argument that the definition of "sexually explicit conduct" in ORS 163.665(3)(f)— applicable in ORS 163.670 and ORS 163.684—is unconstitutionally vague under Article I, sections 20[7] and 21,[8] of the Oregon Constitution. Defendant's primary argument is that the phrase "other intimate parts" fails to inform a person of ordinary understanding what conduct is prohibited and, thus, that it is unconstitutionally vague. *See* ORS 163.665(3) (f) (defining "sexually explicit conduct," in part, as the "actual or simulated *** [l]ewd exhibition of sexual or *other intimate parts*" (emphasis added)).

---

[7] Article I, section 20, provides, "No law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens."

[8] Article I, section 21, provides in relevant part, "No *ex-post facto* law, or law impairing the obligation of contracts shall ever be passed, nor shall any law be passed, the taking effect of which shall be made to depend upon any authority, except as provided in this Constitution."

To withstand a vagueness challenge, the terms of a criminal statute "must be sufficiently explicit to inform those who are subject to it of what conduct on their part will render them liable to its penalties." *State v. Graves*, 299 Or 189, 195, 700 P2d 244 (1985). To that end, "[a] criminal statute need not define an offense with such precision that a person in every case can determine in advance that a specific conduct will be within the statute's reach. However, a reasonable degree of certainty is required by Article I, sections 20 and 21." *Id.*

On appeal, defendant contends that ORS 163.665(3)(f)'s definition of "sexually explicit conduct" is "problematic because 'intimate part' is not statutorily defined" and because the provision is so broad that it "gives unbridled discretion to judges and juries."

Although defendant is correct that the phrase "other intimate parts" is not expressly statutorily defined, the Supreme Court has previously interpreted that phrase in the context of ORS 163.305(6) (1983)[9] and concluded that it was sufficiently clear to withstand a constitutional challenge. More specifically, in *State v. Woodley*, the Supreme Court determined that "other intimate parts" includes areas that are "subjectively intimate to the person touched, and either known by the accused to be so or to be an area of the anatomy that would be objectively known to be intimate by any reasonable person." 306 Or 458, 463, 760 P2d 884 (1988). After considering that interpretation of the phrase "other intimate parts," the court concluded that it did not violate constitutional standards for vagueness. *Id.* at 463 (explaining that because the phrase was "focused on the understanding of each of the two persons concerned, not on the factfinder's estimation of undifferentiated social standards" it "survive[d] the test of vagueness"); *see also State v. Miles*, 273 Or App 271, 278, 357 P3d 522, *rev den*, 358 Or 449 (2015) (describing *Woodley* and the manner in which

---

[9] ORS 163.305 has been amended numerous times since 1983. *See* Or Laws 1999, ch 949, § 1; Or Laws 2009, ch 770, § 1; Or Laws 2017, ch 318, § 2; Or Laws 2017, ch 634, § 17; Or Laws 2021, ch 82, § 1; Or Laws 2023, ch 407, § 1. ORS 163.305(6) (1983) defined "sexual contact" as "any touching of the *sexual or other intimate parts* of a person or causing such person to touch the sexual or other intimate parts of the actor for the purpose of arousing or gratifying the sexual desire of either party" (emphasis added).

the court's construction of the phrase "other intimate parts" "solve[d] the problem of vagueness"). In short, defendant's vagueness argument is contrary to the Supreme Court's decision in *Woodley*. Accordingly, for the same reasons expressed in *Woodley*, we conclude that the legislature's definition of "sexually explicit conduct" in ORS 163.665(3)(f) provides a reasonable degree of certainty as to what conduct is prohibited in ORS 163.670 and ORS 163.684 and that, therefore, the definition is not unconstitutionally vague.

Furthermore, we are unpersuaded that the definition of "sexually explicit conduct" is void for vagueness under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.[10] Due process requires that a penal statute define the criminal offense with sufficient definiteness so that people of ordinary intelligence can understand what conduct is prohibited in a manner that does not encourage arbitrary and discriminatory enforcement. *Hoffman Estates v. Flipside*, *Hoffman Estates, Inc.*, 455 US 489, 498, 102 S Ct 1186, 71 L Ed 2d 362 (1982); *Smith v. Goguen*, 415 US 566, 572-73, 94 S Ct 1242, 39 L Ed 2d 605 (1974). Accordingly, for due process purposes, a statute is impermissibly vague if it either contains no identifiable standard, *see Kolender v. Lawson*, 461 US 352, 358, 103 S Ct 1855, 75 L Ed 2d 903 (1983), or employs a standard that relies on the shifting and subjective judgments of the persons who are charged with enforcing it, *City of Chicago v. Morales*, 527 US 41, 62, 199 S Ct 1849, 144 L Ed 2d 67 (1999).

ORS 163.665(3)(f), as presently drafted and construed by our courts, contains an identifiable standard for determining what constitutes "sexually explicit conduct" and does not rely on the shifting or subjective judgments of the persons responsible for enforcing the criminal statutes applying that definition. To fall within the scope of that definition as it is used in ORS 163.670 and ORS 163.684, an exhibition must involve a child, it must be "objectively lewd" in the sense that it is "salacious or focused on sex," and it must involve parts of the child's body that were subjectively intimate to the child and that the accused either knew or

_____

[10] The Fourteenth Amendment provides, in relevant part, "No State shall * * * deprive any person of life, liberty, or property, without due process of law."

reasonably should have known were regarded by the child as intimate. *Woodley*, 306 Or at 463 (explaining that "other intimate parts" includes areas that are "subjectively intimate to the person touched, and either known by the accused to be so or to be an area of the anatomy that would be objectively known to be intimate by any reasonable person"); *State v. Parra-Sanchez*, 324 Or App 712, 733, 527 P3d 1008, *rev den*, 371 Or 333 (2023) (explaining that "'lewd exhibition' means the showing of a child's sexual or other intimate parts that is itself salacious or focused on sex"). Those standards are sufficient to allow an ordinary person to understand what conduct is prohibited. Furthermore, the fact that the "intimate parts" test includes both objective and subjective components sufficiently constrains the factfinder so as to discourage arbitrary and discriminatory enforcement. In sum, ORS 163.665(3)(f), as applicable through ORS 163.670 and ORS 163.684, does not violate federal constitutional standards for vagueness.

Finally, we turn to defendant's argument that ORS 163.665(3)(f) is unconstitutionally overbroad in violation of the First Amendment to the United States Constitution.[11] A statute is facially overbroad if it proscribes a substantial amount of protected conduct in relation to its legitimate sweep. *Broadrick v. Oklahoma*, 413 US 601, 615, 93 S Ct 2908, 37 L Ed 2d 830 (1973). In contrast, a statute is not overbroad merely because it is possible to conceive of some impermissible applications. *United States v. Williams*, 553 US 285, 303, 128 S Ct 1830, 170 L Ed 2d 650 (2008). Defendant contends that ORS 163.665(3)(f) is overbroad under that standard because "ORS 163.665(3)(f), utilized in ORS 163.670 and ORS 163.684, proscribes a 'substantial' amount of protected speech" in that it "proscribes 'simulated' acts that do not involve the sexual exploitation of children" and because "'intimate part' could quite literally be anything the person depicted subjectively believes would be intimate."

We begin with defendant's argument that ORS 163.665(3)(f) is overbroad because it proscribes "'simulated' acts that do not involve the sexual exploitation of

___

[11] The First Amendment provides, in relevant part, "Congress shall make no law * * * abridging the freedom of speech." The First Amendment is made applicable to the states through the Due Process Clause of the Fourteenth Amendment. *Gitlow v. New York*, 268 US 652, 666, 45 S Ct 625, 69 L Ed 1138 (1925).

children." At the outset, we reiterate the limited nature of what ORS 163.665(3)(f) criminalizes, as it applies through ORS 163.670 and ORS 163.684. The portion of ORS 163.670 involved in this case criminalizes the creation of a very specific kind of material *i.e.*, child pornography, and the portion of ORS 163.684 that is at issue criminalizes the dissemination of depictions of child sexual abuse. *See State v. Zamora*, 326 Or App 140, 145, 530 P3d 914 (2023) (describing ORS 163.670 as capturing "the creation of child pornography"). These statutes are directed at a narrow category of visual depictions that involve real children participating in the creation of the material. In that context, and as Supreme Court explained in *Stoneman*, "simulated" exhibitions of sexually explicit conduct refers to sexual acts in which an actual child participates—"the child's participation in the act must be real, *i.e.*, the sexual *act* may be 'simulated,' but the child's participation in that act cannot be." 323 Or at 540 (emphasis in original). As the state points out, to run afoul of ORS 163.670 or ORS 163.684, those simulations must involve actual child abuse. *See id.* at 540-41 (upholding a similar statute criminalizing the purchase of child pornography and explaining that "simulated" sexual conduct must involve the real participation of an actual child; the statute's reach was confined to material that could come into existence only through child sexual abuse). With these statutes so framed, we conclude that, to the extent these statutes are capable of encompassing protected expression, it is incidental and not substantial in relation to the purpose of these statutes: protecting children from sexual exploitation.

We also disagree with defendant's argument that ORS 163.665(3)(f) is overbroad because "'intimate part' could quite literally be anything the person depicted subjectively believes would be intimate." Defendant's argument misapprehends the standard that is used to determine whether something constitutes an "intimate part" within the meaning of ORS 163.665(3)(f). Contrary to defendant's assertion, and as we have previously explained, that standard involves both a subjective and an objective analysis. More specifically, "other intimate parts" includes areas that are "subjectively intimate to the person touched, and either known by the accused to be so or to be an area of the anatomy that would

be objectively known to be intimate by any reasonable person." *Woodley*, 306 Or at 463. That two-part inquiry ensures ORS 163.665(3)(f) remains tethered to a clear and knowable threshold of intimacy and sufficiently avoids criminalizing depictions that fall outside the intended scope. Accordingly, we conclude that ORS 163.665(3)(f) is not overbroad.

In sum, the trial court did not err in denying defendant's motion to "Dismiss and/or Demurrer."

### III.    MOTION TO EXCLUDE OUT-OF-COURT STATEMENTS

In his eighth assignment of error, defendant argues that the trial court erred by admitting certain exhibits showing defendant's text messages with people who did not testify at trial. More specifically, defendant contends that the admission of those exhibits violated his right to confrontation under Article I, section 11, of the Oregon Constitution and the Confrontation Clause of the Sixth Amendment to the United States Constitution.

Before describing defendant's confrontation argument on appeal, we describe the evidence at issue. That evidence consists of communication logs that Trenary created based on records he received from Pinger and TextNow. In particular, the communication logs at issue contained text messages between defendant and four individuals—S, 9824, K, and KM1. The logs showed that defendant engaged in sexually explicit conversations with S, 9824, K, and KM1 and that, during those conversations, they all referenced being 15 years old or younger. For instance, in the communication log relevant to K, defendant asked K, "How old ru," to which K responded, "I'm 13." Furthermore, with respect to 9824 and K, upon learning their ages, defendant chose to lie to them about his age by claiming to 9824 that he was "14" and by separately telling K that he was in "8th" grade.

The communication logs also showed that defendant requested explicit videos and/or photos from S, 9824, K, and KM1. For example, the log relevant to KM1 contained the following exchange:

> "[Defendant]:   Umm I dare you to send the sexiest pic on your camera roll of either you or your friend."

"[KM1]:   Hold on it'll take a minute I have a lot of pictures in my camera roll"

"[Defendant]:   It's okay if it's nude"

That same communication log also showed that defendant later "dared" KM1 to "take a video of [herself] taking [her] shirt off for [him]."

During trial and while Trenary was testifying about his investigation into defendant's case, the state sought to introduce the communication logs. In response to the state's offer of evidence and as a question in aid of objection, defendant asked Trenary whether he knew S, 9824, or K. Trenary responded that he "d[id] not know who th[ose] pe[ople] [were]." Defendant further asked Trenary whether S, 9824, or K, could be an adult, and Trenary answered that they "could be anyone." With respect to KM1, defendant asked Trenary whether he had ever personally spoken with KM1, and Trenary responded that he had not. Defendant then objected to the admission of all four of the communication logs on authentication, hearsay, and confrontation grounds.

With respect to his confrontation argument, defendant contended that the communication logs contained hearsay statements from S, 9824, K, and KM1 and that, because the state had not called them to testify, admitting the logs violated his right to confront the witnesses against him. More specifically, defendant argued that

"[t]he fact that these other people who Detective Trenary does not even know who they are, whether or not they're adults definitionally means *** that to prove its case the fact finder has to take the received statements as truth to establish age, to establish whether or not that person engaged in sexually explicit conduct, to establish whether or not the photo or video that was sent is of that individual person as opposed to another adult like [defendant] who has different images."

Thus, defendant contended that "to the extent that the state is relying on [the communication logs] for their truth these are subject to confrontation."

In response, the state argued that because defendant participated in the conversations with S, 9824, K, and KM1, half the statements were defendant's own, and the other half were admissible as "adoptive admissions." OEC 801(4)(b)(B) (exempting from the hearsay rule a statement that is offered against a party and is "[a] statement of which the party has manifested the party's adoption or belief in its truth"). The state further argued that any messages from S, 9824, K, and KM1 were "not hearsay statements because they are not presented to prove the truth of the matter asserted" and because they were instead being offered to provide "context for * * * defendant's admissions and his statements."

In rebuttal, defendant pointed to the specific portions of the communication logs in which S, 9824, K, and KM1 identified their ages. Defendant contended that, to the extent that the state was relying on those statements to "prove the age of the person [defendant was] speaking with," those statements constituted hearsay and were not subject to an exception. He further argued that, "if [those statements were] only coming in to show the effect that it had on [defendant] that's fine, so long as the fact finder is crystal clear that the content of any received messages cannot establish a fact."

The trial court overruled defendant's objection to the admission of the communication logs on two separate grounds. First, it admitted certain portions of the logs as "adoptive admissions," specifically the messages in which S, 9824, K, and KM1 mentioned their ages. The court explained that those messages were not being admitted for the truth of the matter asserted, but to show defendant's belief about their ages, as reflected in his responses. However, the court agreed with defendant that those statements were not admissible to establish "as fact that the recipient is 13, 15 or whatever." Second, the court admitted the remainder of the messages from S, 9824, K, and KM1 as "context" for defendant's own messages. In admitting those remaining statements as "context," the court explained that they were being admitted to provide "context of what the ongoing threads are actually saying," rather than for "the truth of the matter asserted."

On appeal, defendant renews his argument that the admission of the communication logs violated his right to confront witnesses under both Article I, section 11, of the Oregon Constitution and the Sixth Amendment to the United States Constitution. We review the trial court's ruling on constitutional confrontation issues for errors of law. *State v. Kini*, 305 Or App 833, 835, 473 P3d 64 (2020).

We begin with defendant's argument under the state constitution. *Sterling v. Cupp*, 290 Or 611, 614, 625 P2d 123 (1981) ("The proper sequence is to analyze the state's law, including its constitutional law, before reaching a federal constitutional claim."). Article I, section 11, of the Oregon Constitution guarantees a criminal defendant the right to confront and cross-examine adverse witnesses.[12] *State v. Copeland*, 353 Or 816, 827-28, 306 P3d 610 (2013). Under both constitutions, the confrontation right applies to hearsay statements—that is, statements "other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." OEC 801(3) (defining hearsay); *see State v. Ruggles*, 214 Or App 612, 619, 167 P3d 471, *adh'd to as modified on recons*, 217 Or App 384, 175 P3d 502 (2007), *rev den*, 344 Or 280 (2008) (explaining that, because the "constitutional provisions work to limit the introduction of hearsay testimony," whether a particular piece of evidence "offends [a] defendant's rights to confront witnesses depends, in the first instance, on whether it is hearsay evidence"). As such, we begin with that threshold question.

With respect to the trial court's decision to admit the messages from S, 9824, K, and KM1 about their ages, the state argues that the trial court correctly ruled that those messages were "relevant and admissible as non-hearsay under OEC 801(4)(b)(B)." Although we question whether the adoptive admission rule applies on these facts, we need not resolve that issue here. Regardless of that specific theory, we conclude that the messages were not hearsay because they were not offered for the truth of the matter asserted. Rather the messages were introduced to show defendant's

---

[12] Article I, section 11, of the Oregon Constitution provides, "In all criminal prosecutions, the accused shall have the right to *** meet the witnesses face to face."

belief about the ages of the people he was messaging, making them admissible as non-hearsay.

As for the remaining text messages from S, 9824, K, and KM1 in the communication log, when the trial court admitted them into evidence, it concluded that the messages were "not being offered for the truth of the matter asserted," but rather to provide "context" for defendant's statements.[13] The state argues that, under *State v. Davis*, 291 Or App 146, 159, 419 P3d 730, *rev den*, 363 Or 481 (2018), the trial court's reason for admitting the statements from S, 9824, K, and KM1 was a permissible non-hearsay use of that evidence. In *Davis*, we held that "the victim's statements in [a text message] conversation with defendant were themselves admissible as non-hearsay context for defendant's admissible statements." *Id.* at 159. Here, as in *Davis*, the messages from S, 9824, K, and KM1 provide necessary context for understanding defendant's corresponding half of the conversations. Therefore, pursuant to our holding in *Davis*, we agree with the state that the trial court did not err in admitting the remaining messages from S, 9824, K, and KM1 and in determining that those messages were not hearsay.

Because the threshold requirement for a confrontation claim under the state constitution is that the evidence constitutes hearsay, and because we conclude that the trial court did not err in determining that the communication logs did not contain hearsay, defendant's confrontation claim under Article 1, section 11, necessarily fails. That conclusion also resolves defendant's claim under the federal constitution, which similarly requires the admission of hearsay to trigger the protections of the Confrontation Clause. *Crawford v. Washington*, 541 US 36, 59 n 9, 124 S Ct 1354, 158 L Ed 2d 177 (2004) (explaining that the federal Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted"). To the extent that defendant suggests that, notwithstanding the trial court's express ruling, the evidence was ultimately used for a hearsay purpose, he fails to develop any argument

---

[13] We note that the text messages from defendant plainly fall within the hearsay exclusion for opposing-party statements. That exclusion provides that "[a] statement is not hearsay if * * * [t]he statement is offered against a party and is * * * [t]hat party's own statement." OEC 801(4)(b)(A).

explaining how that later use made the court's earlier ruling erroneous. We therefore do not address it further. *Beall Transport Equipment Co. v. Southern Pacific*, 186 Or App 696, 700 n 2, 64 P3d 1193, *adh'd to as clarified on recons*, 187 Or App 472, 68 P3d 259 (2003) ("[I]t is not this court's function to speculate as to what a party's argument might be. Nor is it our proper function to make or develop a party's argument when that party has not endeavored to do so itself.").

In sum, the trial court did not err in admitting the communication logs containing defendant's conversations with S, 9824, K, and KM1.

IV.   MOTIONS FOR JUDGMENTS OF ACQUITTAL

Defendant raises 23 assignments of error relating to the trial court's denial of his motions for judgment of acquittal. His challenges relate to the evidence that the state offered to prove encouraging child sexual abuse (ECSA), using a child in a display of sexually explicit conduct (UCDSEC), and luring. We begin by describing what those charges required the state to prove. We then explain the bases for defendant's motions for judgment of acquittal on those charges. Lastly, we explain why, except for five counts related to one victim on which the state concedes error, we reject defendant's challenges.

As relevant here, a person commits ECSA if the person "[k]nowingly develops, duplicates, publishes, prints, disseminates, exchanges, [or] displays *** a visual recording of sexually explicit conduct involving a child" and the person "[k]nows or is aware of and consciously disregards the fact that creation of the visual recording of sexually explicit conduct involved child abuse." ORS 163.684. As also relevant here, a person commits UCDSEC if the person "compels or induces a child to participate or engage in sexually explicit conduct for any person to observe or to record in a visual recording." ORS 163.670. Both statutes contain the phrase "sexually explicit conduct," which, as relevant here, is defined to include "[m]asturbation" and the "[l]ewd exhibition of sexual or other intimate parts." ORS 163.665(3).

A person commits the crime of luring a minor if that person "furnishes to, or uses with, a minor *** a visual representation or explicit verbal description or narrative account of sexual conduct for the purpose of inducing the minor or purported minor to engage in sexual conduct." ORS 167.057.

Defendant, as he did below, argues that he was entitled to judgments of acquittal on each of the charges for UCDSEC and ECSA. He raises three arguments that encompass both those statutes. First, he asserts that the state presented insufficient evidence that the images at issue were "lewd," as both statutes require. Second, he argues that he was entitled to judgments of acquittal because the state failed to prove that breasts are a "sexual or intimate part." And third, he argues that he was entitled to judgments of acquittal on two of the UCDSEC charges and two of the ECSA charges because they were based on acts that defendant committed while in California, outside of Oregon's jurisdiction. Defendant additionally argues, as to the UCDSEC charges, that he was entitled to judgments of acquittal because the state failed to prove that: (1) defendant compelled or induced the victims to engage in sexually explicit conduct; (2) the victims' participation or engagement in sexually explicit conduct was causally related to defendant's compulsion or inducement; and (3) that he was "using a child" in the display. Furthermore, defendant contends that the state's evidence was legally insufficient to support defendant's conviction for UCDSEC in Case No. 20CR26835, Count 14. Finally, he argues that he was entitled to a judgment of acquittal on the luring charges because, in defendant's view, there was no evidence that he used a narrative account of sexual conduct to induce a minor to engage in sexual conduct.

Before addressing the merits of each of those arguments, we accept the state's concession that the ECSA and UCDSEC charges that were based on conduct that defendant engaged in while in California cannot be the basis for convictions in Oregon. We therefore reverse defendant's convictions on Counts 5, 6, 7, 8, and 9 in Case No. 20CR26835. We now turn to the merits of defendant's remaining arguments.

A.   *A rational trier of fact could conclude that the images
     that the state offered were "lewd," as required for both
     UCDSEC and ESCA (20CR26835, Counts 2-3, 11-12, 14;
     20CR58130, Counts 5-6, 10, 12, 15-16).*

As noted, both UCDSEC and ESCA (as alleged in this case) require proof that the images that defendant sent the victims constituted "lewd exhibition of sexual or other intimate parts." The images at issue include photographs of one victim pulling up her shirt and revealing her bare breasts, an image of one victim taking a "selfie" of herself in the mirror, bare breasted, an image of one victim's "butt," a photograph of one victim's genitals, as well as images (taken as screenshots from a video) showing one of the victims masturbating. The images were sent in the context of defendant asking the victims to send him additional explicit images and sending sexually explicit text messages. As to that last piece of evidence—screenshots from a video of one of the victims masturbating—the record shows that the victim recorded the video and sent it to defendant after he urged her to send images of her "fingering" herself.

Defendant contends that a rational trier of fact could not find that the images constituted "lewd exhibition."[14] He relies on our recent decision in *Parra-Sanchez*, in which we concluded that "whether something constitutes a lewd exhibition is determined by reference to objective standards." 324 Or App at 733. Determining whether an exhibition is "lewd" depends on

> "the characteristics of the exhibition as it would be perceived by a viewer of the display or recording, and not through an examination of the subjective intentions of the child, the intended viewer, or the person creating the display, if that person is someone other than the child or the viewer."

*Id.* "Mere nudity can be encompassed in the definition of 'lewd exhibition' when it can be said to be lascivious or salacious—not simply nudity in the context of ordinary, daily activities

---

[14] In his opening brief, defendant broadly asserted that none of the images offered at trial were "lewd." In his reply brief, he identified certain images—of the victims' breasts, of a victim's buttocks, of a victim's vagina that is "suggestive of masturbation," and another of a victim masturbating—and suggests that those particular images are not lewd. As we explain below, we disagree that those images are not lewd.

such as showering or dressing." *Id*. at 721.[15] We adopted six factors as "useful guideposts" in applying that objective standard:

- "'[W]hether the focal point *** is on the child's genitalia or pubic area;'"

- "'[W]hether the setting of the visual depiction is sexually suggestive, *i.e.*, [whether it is] in a place or pose generally associated with sexual activity;'"

- "'[W]hether the child is depicted in an unnatural pose, or in inappropriate attire, considering the age of the child;'"

- "'[W]hether the child is fully or partially clothed, or nude;'"

- "'[W]hether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity;'" and

- "'[W]hether the visual depiction is intended or designed to elicit a sexual response in the viewer.'"

*Id*. at 733-34 (quoting *United States v. Dost*, 636 F Supp 828, 832 (SD Cal 1986), *aff'd sub nom United States v. Wiegand*, 812 F2d 1239 (9th Cir), *and aff'd*, 813 F2d 1231 (9th Cir), *cert den*, 484 US 856 (1987)). The weight to be given to each factor "will depend ultimately on the circumstances of the trial"; not all factors have to be present for a trier of fact to find a lewd exhibition. *Id.* at 735.

We conclude that a rational trier of fact could find that the images at issue here constituted lewd exhibition because they were "salacious or focused on sex." *Id.* at 733. As the state observes, those images satisfy most of the factors that we adopted in *Parra-Sanchez*.[16] At defendant's request, the victims—who were children—took photographs

_____

[15] In *Parra-Sanchez*, we concluded that the evidence was insufficient to support the defendant's convictions for UCDSEC. 324 Or App at 718. The defendant was charged with that crime after he looked at his daughter while she was in the shower or while she was getting dressed. *Id.* at 715. We concluded that there was no evidence of a display that was "itself salacious or focused on sex" even if the defendant himself viewed his daughter's nude body for his own sexual gratification. *Id.* at 736-37.

[16] The state urges us to consider, in applying the *Dost* factors, the context in which the images were sent, *i.e.*, a series of graphic and sexually charged conversations with defendant. Defendant has offered no argument as to why, in the context of the objective test we adopted in *Parra-Sanchez*, we cannot consider such context. That said, because a rational trier of fact could conclude that the images—even absent that context—are lewd, we do not decide that question today.

of their breasts and genitals and, in one instance, created a video of herself masturbating. The focal points of many of the images and video were of a victim's genitalia, as described in the first factor; the evidence would support an inference that the images were "generally associated with sexual activity" and suggesting a "willingness to engage in sexual activity" given that some involved victims pulling up their shirts to expose their bare breasts, exposing their genitals, and masturbating, as described in the second and fifth factors; and the victims were nude and not in natural poses or dressed in appropriate clothing, as described in the third and fourth factors. *Id.* at 734. Simply put, we are persuaded that, in the light most favorable to the state, a rational trier of fact could find that the images were salacious and focused on sex.

B.  *A rational trier of fact could find that the victims' breasts constituted a "sexual or intimate part," as required for both UCDSEC and ESCA (20CR26835, Counts 2-3, 11-12, 14; 20CR58130, Counts 5-6, 10, 12, and 15-16).*

Defendant next asserts that breasts are not a "sexual or intimate part," as required by both the UCDSEC and ESCA statutes, and so no rational trier of fact could have found defendant guilty of those crimes based on photographs of the victims' breasts. Defendant's argument is foreclosed by *State v. Woodley*, 306 Or 458, 760 P2d 884 (1988). We are bound by that case and are unpersuaded by defendant's attempts to distinguish it.

C.  *A rational trier of fact could find that (1) defendant induced the victims to engage in sexually explicit conduct and (2) the victims' participation or engagement in sexually explicit conduct was causally related to defendant's inducement, as required for the UCDSEC charges. (20CR26835, Counts 2, 11-12, 14; 20CR58130, Counts 5, 6, 10, 16).*

Defendant next argues that the state's evidence was legally insufficient to prove that defendant committed UCDSEC because the state failed to prove that defendant "induced" any of the victims to engage in sexually explicit conduct or that he caused the victims to engage in sexually explicit conduct. As to the first argument, he maintains that "inducing" a child to act "requires the defendant to influence

an act or course of conduct \* \* \* by 'persuasion or reasoning.'" Even assuming that is what is required (and defendant cites no authority on that point), the evidence shows that defendant's conduct meets that definition. He used deception and manipulation to convince the children to engage in sexually explicit conduct—specifically, lewd display of intimate parts—photograph themselves, and send the images to him.

As to his second argument—that the evidence was insufficient to prove any of the UCDSEC or attempted UCDSEC charges because there was "no evidence" that he actually caused any child to engage in sexually explicit conduct—we again disagree. Defendant acknowledges that the record contains evidence that he "cajoled" and "manipulated" children to send him images of themselves undressed; however, he asserts that it is possible that the images that the victims sent him were ones that they already had. Reviewing the evidence in the light most favorable to the state, we conclude that there is ample evidence in the record from which a trier of fact could conclude that defendant persuaded the victims to create the images for him and at his request.

D.  *A rational trier of fact could find that defendant was guilty of UCDSEC based on images relating to that charge (20CR26835, Count 14).*

Defendant maintains that the jury could not find him guilty of UCDSEC as charged in Count 14 because the state did not offer any lewd image associated with that charge. Having reviewed the record, we conclude that the state offered a number of explicit images that the victim sent defendant at his behest that would permit a rational trier of fact to find that defendant committed this particular count of UCDSEC.

E.  *A rational trier of fact could find that defendant engaged in a narrative description of sexual conduct with the purpose of inducing the victims to do the same, as required for the crime of luring a minor (20CR26835, Counts 1, 4, 10, 13, 15; 20CR58130, Counts 11, 17).*

Lastly, defendant argues, briefly, that no rational trier of fact could find that defendant committed the crime of luring a minor. As noted above, a person commits that

crime if they "furnis[h] to, or use[ ] with, a minor, a police officer posing as a minor or an agent of a police officer posing as a minor, a visual representation or explicit verbal description or narrative account of sexual conduct for the purpose of inducing the minor or purported minor to engage in sexual conduct." ORS 167.057(1)(a). Defendant appears to maintain that there is no evidence that he sent explicit texts with the purpose of inducing the victims to engage in sexual conduct. Having reviewed the evidence of the text messages between defendant and the victims, we disagree. Evidence that defendant urged the victims to "finger" themselves and to have sex with their boyfriends (while thinking of him) was sufficient for a rational trier of fact to conclude that defendant sent those messages to induce the victims to engage in sexual conduct themselves.

In Case No. 20CR26835, convictions on Counts 5, 6, 7, 8, and 9 reversed; remanded for resentencing; otherwise affirmed. In Case No. 20CR58130, remanded for resentencing; otherwise affirmed.