No. 76                  February 11, 2026                  1

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

DANIELLE ANN MORIN,
*Defendant-Appellant.*

Washington County Circuit Court
20CR18715; A177976

Theodore E. Sims, Judge.

Argued and submitted May 31, 2024.

Shawn Wiley, Deputy Public Defender, argued the cause for appellant. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Oregon Public Defense Commission.

Philip Thoennes, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Joyce, Presiding Judge, Lagesen, Chief Judge, and Armstrong, Senior Judge.

LAGESEN, C. J.

Reversed and remanded.

**LAGESEN, C. J.**

Defendant appeals a judgment of conviction for second-degree murder with a firearm (Count 1), ORS 163.115, and unlawful use of a weapon (Count 2), ORS 166.220. On appeal, defendant raises three assignments of error, relating to the denial of her motions to suppress evidence obtained from cellular service providers and from a search of defendant's van.[1] We conclude that the trial court correctly denied defendant's motions to suppress with respect to the records obtained from the cellular service providers but erred in denying defendant's motion to suppress the evidence obtained in the search of her van. We therefore reverse and remand.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

In this appeal, defendant contends that law enforcement searches that led to her identification, apprehension, and ultimate conviction violated the state constitution, requiring suppression of some or all of the evidence obtained as a result of those searches. The facts relevant to those issues are the ones pertaining to the officers' investigation of the homicide. With respect to the challenges to the searches and seizures conducted under the warrants directed to Verizon and AT&T, we draw those facts from the affidavits supporting those search warrants. *State v. Meyers*, 338 Or App 59, 62, 565 P3d 463 (2025) ("We state the uncontroverted facts as recited in the affidavit supporting the request for the search warrant.").

With respect to the search of the van, however, the question is whether a warrant issued at all. We draw the relevant facts from the evidence developed at the hearing on the motion to suppress. On that issue, we note that the underlying historical facts are not disputed. The question is whether those historical facts allow for the legal conclusion that a legally valid warrant issued. In that regard, we disagree with the state's argument that, under the circumstances present here, whether a warrant authorized the search of the van is a

---

[1] Defendant raises a fourth assignment of error relating to a fourth warrant. We do not address that assignment because, as defendant recognized at oral argument, the trial court suppressed the evidence obtained pursuant to that warrant.

factual question, such that the trial court's finding that there was a warrant binds us on appeal. Here, no formal search warrant was ever issued; it is undisputed that the issuing magistrate's signature was affixed to the affidavit supporting the warrant request; it is undisputed that no draft warrant was transmitted to the magistrate for review and approval; and it is undisputed that the magistrate, upon reviewing the probable cause affidavit, did not draft and sign a warrant himself. The question whether that constellation of historical circumstances resulted in the issuance of a legally valid warrant is, in our view, a question of law for the court.

With those clarifications, we turn to the facts.

A.  *Underlying Facts*

On March 6, 2020, officers responded to an Embassy Suites Hotel after the manager of the hotel discovered a man in room 921 who appeared to be dead from gunshot wounds. The manager told officers that the man, L, had checked into the room that morning at 10:39 a.m. Officers found a cell phone in the hotel room on the nightstand. A forensic examiner examined it and discovered that the phone belonged to L and that on the evening of March 5 there were three phone calls between L's phone and a phone number ending in 9787. The examination also revealed text messages exchanged between L's phone and the 9787 phone. On the evening of March 5, L texted, "Can't wait" and "Did you get the text we are on [?]" The 9787 number responded, "Yes! See you tomorrow" and "Let me know your room number once you have it." The following morning, L texted, "Probably half hour," and then at 10:29 a.m. he texted, "Just pulling in now," and at 10:40 a.m., "Rm 921." The 9787 number replied at 10:54 a.m., "Ok see you soon."

Based on that information, Detective Lee of the Tigard Police Department applied for a search warrant for Verizon's records of the 9787 phone from March 1 to March 8, 2020. Lee requested authorization to obtain the following categories of information about the 9787 phone:

"1.  All available subscriber information to include name, address, billing and credit card information, alternate contact information including phone and e-mail

"2.   All Call Detail Records (CDR) with cell site information, including cell site and cell sector information

"3.   Any and all text message content that may be available

"4.   Any and all picture message content that may be available

"5.   Excel spreadsheet detailing all of the cell site and tower locations with cell site and sectors for all markets represented in the call detail records and toll records

"6.   Any and all geolocation information in the possession of Verizon Wireless for the aforementioned account to include Verizon RTT, EVDO, ALULTE, and Levdort reports or their equivalent

"7.   Any document, files, or media currently in the possession of Verizon; Attn: VSAT in reference to the above listed customer number"

In support of that request, Lee submitted an affidavit that explained the details of the ongoing investigation up to the point of applying for the warrant. This explanation included copies of the texts between L and the number arranging the March 6 meeting. Lee went on to state that "[b]ased upon my numerous investigations into violent crimes including murder, as well as my experience in the analysis of historical cell phone records and cell site information, that the information contained within the business records of third party service providers such as *** Verizon Wireless can yield valuable evidence in criminal investigations such as murder." He further stated that this evidence could be used to corroborate witness statements, reveal communications between L and the number, identify potential co-conspirators to the crime, and reveal the locations of the parties involved in the investigation. In another section, Lee stated that

"based upon my numerous investigations into human trafficking, and more particularly sex trafficking, I believe that the victim, [L] communicated with phone number [9787] in an effort to arrange a prostitution date with the user of that number. Additionally, I personally know from my numerous investigations into both violent crimes involving sex trafficking and have personally investigated shootings and armed robberies in which the victims of the shootings

and the armed robberies were lured to a location by the suspects under the ruse of being a prostitute willing to meet with the victim for the purposes of commercial sex."

Finally, Lee asserted that there was probable cause to believe that the requested records of the phone would yield evidence regarding a murder committed in, and triable in, Washington County, Oregon. Based on that information, a magistrate issued the requested warrant, which officers then executed on Verizon.

In response to the warrant, police received only two types of information: location information and text-message information. The location information enabled Lee to track the movements of the 9787 phone on March 5 and 6. The text message records spanned March 5 to March 9, and included the content of the messages, the phone numbers involved in the exchanges, and the dates and times that the messages were sent or received. Those records included the texts between the 9787 number and L's phone on March 5 and 6, as well as texts between the 9787 number and a few other numbers, including a number ending in 5759. Police did not receive any "picture message content" or subscriber information.

Lee checked public and governmental databases and learned that the 5759 number was registered to Lim. Lee contacted Lim, who told Lee that the woman who contacted him from the 9787 number was, in Lim's words, an "escort" named "Danielle" that he has met with for commercial sex. Lim provided Lee with another cell phone number, ending in 1714, that was associated with "Danielle."

Lee searched public and governmental databases and learned that the 1714 number was registered to defendant; he also learned that the 1714 phone was associated with the cellular provider AT&T. He then applied for a search warrant directed at AT&T's records of the phone from March 1 to March 16, 2020, which was the date of the warrant application. He requested authorization to obtain the following categories of information from AT&T:

"1.   All available subscriber information to include name, address, billing and credit card information, alternate contact information including phone and e-mail

"2.   All Call Detail Records (CDR) with cell site information, including cell site and cell sector information

"3.   Any and all text message content that may be available

"4.   Excel spreadsheet detailing all of the cell site and tower locations with cell site and sectors for all markets represented in the call detail records and toll records

"5.   Any and all geolocation information in the possession of AT&T Wireless for the aforementioned account to include AT&T NELOS reports or their equivalent"

In the affidavit supporting the warrant request, Lee included the same facts that he had recounted in the affidavit in support of the Verizon warrant, as well as his knowledge that "wireless communications" are frequently used between suspects and victims and suspects and co-conspirators, and his knowledge about shootings and robberies related to victims being set up under the guise of prostitution dates.

Lee also included information contained in the Verizon records. Some information duplicated that obtained from L's phone, namely the text messages that L had exchanged with the Verizon number setting up the meeting at the hotel. Other information did not. For example, Lee noted that when the Verizon phone texted L on March 6, 2020, at 10:54 a.m., "Ok see you soon," the location data provided by Verizon "puts the [Verizon] phone at the Embassy Suites Hotel." Lee also included the information learned from the Verizon records about the text exchanges with Lim and that Lee learned from Lim that "Danielle" is an escort whose professional name is "Victoria," that Lim "reluctantly" provided Lee with the 1714 number and told Lee that "[defendant] must still be using that number because on March 6, 2020, she had first messaged him from that number telling him that she was going to be messaging him from a new number" which ended up being the 9787 Verizon number.

The affidavit also included information that, based on surveillance footage from the day of the homicide, police had identified a "possible female suspect" driving a beige Chevrolet minivan with Washington plates. Upon obtaining

a driver's license photo of defendant, Lee "determined with a high degree of confidence that [defendant] is the same person depicted in the *** surveillance footage." Lee also noted that he had learned that defendant has a beige Chevrolet minivan registered to her.

Lee represented that, based on his training and experience, he knows that "[r]ecords such as call detail records (CDR) with cell site information as well as geolocation information *** can yield valuable information regarding the location and movements of the involved parties during the time period surrounding the event under investigation." Further, "[e]ven where the records show that the victim and a party were not in close proximity, or had no contact, this can be valuable exculpatory evidence in the case under investigation."

Based on the foregoing facts, Lee stated that he had probable cause to believe that defendant committed the crime of murder, and that evidence of that crime would be located in the records requested from AT&T. Further, Lee had probable cause to believe that during the time prior to, during, and immediately following the homicide, defendant was communicating with L as well as other potential prostitution customers and as such, AT&T's records would provide "valuable insight not only into the communication between the victim, suspect, witnesses, and possible co-conspirators, but also their locations immediately prior to, during, and following the murder of [L]."

A magistrate issued the warrant as requested. In response to the warrant, AT&T provided subscriber information, including defendant's name and address, as well as information showing the location and movement of the phone on March 5 and 6. Police did not receive any text messages or any other information from AT&T.

Defendant was arrested on April 1, 2020, in Mountlake Terrace, Washington, while she was driving her van. Before searching the van, officers applied by email for a search warrant from a magistrate in Snohomish County, Washington. Attached to the email were three documents related to the search. The first two were affidavits from Lee

that detailed the probable causes for the search of a residence located in Mountlake Terrace and the search of the van.[2] Each affidavit also had additional attachments. One set of attachments gave detailed descriptions of the residence and van, and the other precisely stated the evidence to be seized from the residence and the van. The third document attached to the email was from Detective Leo, a Snohomish County Sheriff's Deputy who was working in conjunction with Lee regarding L's murder. Most of Leo's document was an affidavit explaining his part in the investigation. Leo's affidavit concluded with the same list of proposed searches that Lee had set out in the attachments to his affidavits.

When the magistrate had completed his review of the three documents attached to the email, he believed that he had seen an actual search warrant, when, in fact, he had not reviewed a proposed draft warrant. The magistrate nevertheless authorized the searches described within the documents. In an email to Leo, the magistrate stated that "[y]ou are specifically authorized to affix my name as signature to the affidavit to evidence my finding of probable cause and to the warrant itself to indicate that I have authorized the search therein described." After receiving this response, Leo then affixed the magistrate's signature to his affidavit supporting the search but did not send a warrant to the magistrate for review, or otherwise inquire about the fact that there was no warrant to which the magistrate's signature could be affixed.

The police then searched the van. As a result of that search, they seized a pair of boots and a purse similar in appearance to those worn by the woman in the surveillance video, a box of Hornaday ammunition, latex gloves, duct tape, a baton, a loose round of Hornaday ammunition, and six rounds of Hornaday ammunition contained in a backpack. After the search, Leo left his signed affidavit with the vehicle, in the same manner typically done by the police after they conduct a search pursuant to a search warrant.

---

[2] Defendant also moved at trial to suppress any evidence found within the residence. The state elected not to present any evidence found in the residence at trial, so the only issue on appeal is the denial of the motion to suppress as to the evidence obtained from the search of the van.

The police realized they did not have a search warrant while Leo was reviewing his documents 24 to 48 hours after the search. Leo then notified the magistrate related to the search about the lack of search warrant. On April 7, 2020, the magistrate filed a certificate with the court describing his role in the search warrant application process and stated that "[m]y e-mail of 7:00 PM on April 1, 2020, containing all the elements of a warrant relevant to the analysis, was the functional equivalent of a search warrant."

B.   *Procedural Facts*

   1.   *Motion to suppress evidence from van*

      Before trial, defendant moved to suppress the evidence obtained from the search of the van. She argued that the search was conducted without a warrant and had therefore violated her rights protected by Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution. She further argued that warrantless searches are *per se* unreasonable unless they fall into one of the limited exceptions to the warrant requirement, which this search did not do.

      The state disputed that the search had been conducted without a warrant under the circumstances. Although the state recognized that the form of the alleged warrant was unusual, it contended that, as a functional matter, it had obtained a valid search warrant.[3] The state pointed out that the documentation supporting its request for a warrant contained a written affidavit asserting probable cause, a description of the search that was constitutionally particular, and written judicial authorization of the search, which, according to the state, meant that it had obtained a warrant for purposes of Article I, section 9.

      The trial court determined that the court had issued a legally valid warrant. Based on that conclusion, the court denied the motion to suppress the evidence from the van.

---

[3] At trial, the state argued that, even if there was not a valid search warrant, the search of the van fell into the common law automobile exception of the Article I, section 9, warrant requirement. As the state recognized at oral argument, however, the automobile exception is no longer valid in Oregon. *State v. McCarthy*, 369 Or 129, 177 501 P3d 478 (2021).

    2.   *Motion to suppress evidence obtained from Verizon and AT&T*

Defendant also moved to suppress evidence obtained from Verizon's records of the 9789 phone and AT&T's records of the 1714 phone.[4] Defendant argued that neither warrant satisfied the specificity and overbreadth particularity requirements of Article I, section 9, for warrants to search digital devices established in *State v. Mansor*, 363 Or 185, 421 P3d 323 (2018). Defendant argued that the warrants therefore amounted to general warrants that violated her constitutionally protected privacy interests. She further argued that she had a constitutionally protected privacy interest in the records of her phone created by third-party companies such as Verizon.

The state responded by first arguing that defendant did not have a constitutionally protected privacy interest in records held by third parties. But, to the extent defendant retained a protected privacy interest in any records in the hands of either Verizon or AT&T, the state argued that the *Mansor* particularity requirements did not apply because those requirements only apply to the digital devices themselves and not to the third-party records associated with the devices. The state then argued that the warrants in this case otherwise satisfied the Article I, section 9, and Fourth Amendment particularity requirements because the officers had probable cause to believe that the owner of the phone had murdered L and remained at large and, further, that there was probable cause to believe that the requested records would assist in the identification and apprehension of the person who killed L. The state also argued that the narrow temporal limitations of the warrant were a further indication that the warrants were sufficiently particular. The state also noted that the fact that all records were in the hands of third parties supplied additional protection to any privacy interest retained by defendant in the records. That is because, by virtue of the fact that the information was in the hands of a third party, law enforcement would not be able to scrutinize any records outside of those identified by

---

[4] At trial and on appeal, defendant combined her arguments for the suppression of evidence pursuant to the Verizon and AT&T warrants.

the third parties as falling within the categories identified in the warrant and provided in response to it.

The trial court determined that the warrants were sufficiently particular to satisfy the constitutional requirements imposed by Article I, section 9, and the Fourth Amendment and denied the motion to suppress the evidence obtained under the Verizon and AT& T warrants.[5] A jury convicted defendant of second-degree murder with a firearm and unlawful use of a weapon, and the trial court sentenced her to life imprisonment with the possibility of parole after 25 years. Defendant appeals.

## II.   ANALYSIS

As noted, defendant raises three assignments of error on appeal, challenging the denial of her motions to suppress the evidence obtained pursuant to the Verizon and AT&T warrants and the evidence obtained from the search of her van.[6] For the reasons that follow, we affirm the denial of the motion to suppress the evidence obtained pursuant to the Verizon and AT&T warrants, and we reverse the denial of the motion to suppress the evidence obtained from the search of the van. That search lacked a legally valid warrant, and the state failed to demonstrate that any exception to the warrant requirement authorized it.

A.  *Motion to Suppress Records Obtained Pursuant to Warrants Directed at Verizon and AT&T*

We start with defendant's challenges to the denial of her motion to suppress evidence obtained from Verizon and AT&T. Defendant argues that under the "heightened" particularity standard announced in *Mansor*, certain commands in the warrants were insufficiently particular.[7] The

_____

[5] At the same time, the trial court granted defendant's motion to suppress evidence obtained pursuant to a warrant directed to Apple iCloud afterthe state did not contest that the evidence obtained under that warrant should be suppressed.

[6] Although defendant argues that the warrants were invalid under both Article I, section 9, and the Fourth Amendment, we note that defendant does not develop a separate analysis under the Fourth Amendment. Thus, we resolve defendant's arguments under state law and do not separately analyze defendant's arguments under federal law.

[7] Although we have described the *Mansor* standard as "heightened," it is perhaps more accurate to describe it as "different." The *Mansor* standard is a

state argues that the *Mansor* standard does not apply in these circumstances and that the warrants were sufficiently particular. Alternatively, the state argues that even if the *Mansor* standard applies, the warrants were valid.

Whether a warrant satisfies the particularity requirement of Article I, section 9, is an issue we review for errors of law. *State v. Hargrove*, 327 Or App 437, 443, 536 P3d 612 (2023). When police seize evidence or conduct a search under the authority of a warrant, the defendant bears the burden to prove the unlawfulness of the search or seizure. *State v. Walker*, 350 Or 540, 553, 258 P3d 1228 (2011). In addressing a challenge involving a search or seizure pursuant to a warrant, we look at "the totality of the circumstances presented in the affidavit, * * * and we resolve doubtful or marginal cases in favor of the preference for warrants[.]" *State v. Dimolfetto*, 342 Or App 456, 464, 576 P3d 1009 (2025) (internal quotation marks omitted).

Ordinarily, a warrant satisfies the Article I, section 9, particularity requirement if it "describe[s], with particularity, the place to be searched and the persons or things to be seized." *State v. Rose*, 264 Or App 95, 106, 330 P3d 680, *rev den*, 356 Or 400 (2014). With respect to certain searches of digital devices and data, however, the Supreme Court has held that a different standard applies. *Mansor*, 363 Or at 218 (articulating standard); *State v. Savath*, 298 Or App 495, 447 P3d 1, *rev den*, 365 Or 722 (2019) (applying *Mansor* standard to conclude that a warrant authorizing the search of a cell phone was insufficiently particular). In our recent decision in *Dimolfetto*, we considered which standard applied to warrants seeking digital records in the hands of a third party. We held that the *Mansor* standard generally does not apply to warrants seeking the third-party records. *Dimolfetto*, 342 Or App at 467-68.

In this case, which was briefed before our decision in *Dimolfetto*, defendant's challenge to the Verizon and AT&T warrants rests on her contention that the *Mansor* standard should govern and that "[t]his case is controlled by *Savath*,"

pragmatic one intended to ensure adequate protection of constitutional privacy interests in content contained on the types of devices that were not on anyone's mind when the state and federal constitutions were ratified.

a case involving the search of a cell phone in which we applied the *Mansor* standard. In defendant's view, "information collected and retained by [Verizon and AT&T] is analogous to the 'unprecedented capacity' of electronic devices to 'collect and store a diverse and vast array of personal information,' as identified in *Mansor*." (Quoting *Mansor*, 363 Or at 208.) Defendant notes that service providers like Verizon and AT&T maintain records of "photographs and text messages sent and received by the user, websites and individual pages accessed by the user, and the user's location ***." The nature of these records, defendant asserts, means that the *Mansor* standard should govern the assessment of the warrants' particularity. Defendant further asserts that under that standard, the warrants are not sufficiently particular.

Defendant's arguments perhaps would have force if a warrant authorized officers to comb through the information in the hands of a cell service provider on their own, in search of information pertaining to the crime. But these warrants, as we understand the parties and the trial court to have construed them, are more akin to limited document requests. The warrants simply authorized officers to obtain from the third-party providers circumscribed categories of records from a narrow time period around the crime, and, to the extent the third parties provided responsive records, to examine them for evidence pertaining to L's murder.

As *Dimolfetto* holds, these types of records are not "tantamount to the personal electronic devices" at issue in *Mansor*, and thus the *Mansor* standard does not apply. *Dimolfetto*, 342 Or App at 467 (the defendant's particularity challenge to a warrant to search third-party records for text messages, account information, and a list of contacts did not implicate the *Mansor* standard). Unlike a search of a digital device like a cell phone or computer, the seizures and searches authorized by the warrants here did not "inherently carr[y] with [them]—from the very outset of the [seizure and] search—an enhanced risk of extensive governmental intrusion into the [owner's] privacy interests." *State v. Turay*, 371 Or 128, 140, 532 P3d 57 (2023). Rather, the warrants here were directed to third-party records for limited categories of information over a limited timeframe. So

structured, they did not implicate a risk of the government rummaging through a vast array of defendant's (or anyone else's) personal information. Accordingly, as we explained in *Dimolfetto*, the *Mansor* heightened particularity standard does not apply to "this more limited situation."[8] 342 Or App at 468.

As for whether the warrants satisfied the more generally applicable particularity standard—by "describ[ing], with particularity, the place to be searched and the persons or things to be seized, " *Rose*, 264 Or App at 106—defendant does not argue that the warrants fail to meet that standard. And, as the state points out, the facts of this case are difficult to distinguish from those in *Hargrove*, in which we applied *Rose* to reject the defendant's particularity challenges to similar warrants directed at third parties. *See Hargrove*, 327 Or App at 451-52. We accordingly affirm the trial court's decision denying the motion to suppress the evidence obtained under the Verizon and AT&T warrants.

B.  *Motion to Suppress Evidence Obtained from Van Search*

We turn to defendant's challenge of the denial of the motion to suppress the evidence obtained from the search of her van. The issue is whether, under the circumstances recounted above, that search was conducted pursuant to a valid warrant. We conclude that it was not.

Although we have not located an Oregon case on point, we are persuaded by a United States Supreme Court decision that no valid warrant existed in this case. In *Groh v. Ramirez*, 540 US 551, 124 S Ct 1284, 157 L Ed 2d 1068 (2004), a civil rights action under 42 USC section 1983, the Supreme Court addressed whether a search conducted pursuant to a (purported) warrant that completely omitted the description of the things to be seized violated the Fourth Amendment. 540 US at 563. The Court held that it did. *Id.* The Court concluded that the warrant's lack of a description of the things to be seized rendered the warrant "plainly

---

[8] As noted above and in *Dimolfetto*, "there may be some records maintained by a third-party service provider that store a 'diverse and vast array of personal information,'" which may potentially implicate the *Mansor* standard to prevent an unconstitutional invasion into a person's protected privacy interests. *Dimolfetto*, 342 Or App at 467. The records at issue here, however, do not.

invalid" under the plain terms of the Fourth Amendment. *Id*. at 557. The Court explained as follows:

> "It is incumbent on the officer executing a search warrant to ensure the search is lawfully authorized and lawfully conducted. Because [the officer] did not have in his possession a warrant particularly describing the things he intended to seize, proceeding with the search was clearly 'unreasonable' under the Fourth Amendment."

*Id*. at 563 (internal footnote omitted). In reaching that conclusion, the Court rejected the officer's argument that the warrant application contained the necessary detail, so as to cure the deficient warrant. The Court explained that "[t]he Fourth Amendment by its terms requires particularity in the warrant, not in the supporting documents." *Id*. at 557. The Court also rejected the officer's argument—similar to the state's argument here—that "his search *** was functionally equivalent to a search authorized by a valid warrant, " in view of the facts that "a Magistrate authorized the search on the basis of adequate evidence of probable cause, [the officer] orally described to [the homeowners] the items to be seized, and that the search did not exceed the limits intended by the Magistrate and described by" the officer. *Id*. at 558. The Court explained that a valid warrant is not a mere formality, and that the omission of the description of the items to be seized meant that "the warrant was so obviously deficient that we must regard the search as 'warrantless' within the meaning of our case law." *Id*. at 558-59.

Although we would be free to take a different approach under Article I, section 9, the Supreme Court's analysis in *Groh* accords with the plain text of Article I, section 9, and we find it persuasive. Applying that reasoning to the facts of this case, if a warrant that lacks a description of the items to be seized is plainly invalid and cannot be cured by the fact that the steps to procure a valid warrant had been followed, it necessarily follows that a warrant that never issues at all, despite proper process, cannot constitute a valid warrant. Again, as the Supreme Court explained in *Groh*, a warrant is a critical safeguard of the right to be free from unreasonable government intrusion, a right secured to Oregonians by both Article I, section 9, and the Fourth

Amendment. We would erode that critical constitutional safeguard by holding that a warrant that never existed could nevertheless operate as a valid warrant.

Thus, the search of defendant's van was a warrantless search. Because the state has not demonstrated that an applicable warrant exception applies, *see, e.g.*, *State v. Bake*r, 350 Or 641, 647, 260 P3d 476 (2011), defendant is entitled to suppression of the evidence seized as a result of the search of her van, and the trial court erred in concluding otherwise.

The remaining question is whether that error is harmless. It is not. The murder weapon was not recovered, but the ammunition found in defendant's van provided a significant evidentiary link between defendant and the homicide. Under those circumstances, we cannot say there is little likelihood that the admission of evidence that should have been suppressed affected the jury's verdict. *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003) (stating test for harmless error). Accordingly, we must reverse and remand.

Reversed and remanded.